PETTIGREW, J.
laThis suspensive appeal by defendant, The Dow Chemical Company (Dow), presents two assignments of error challenging the trial court’s final judgment in this groundwater contamination case. Plaintiffs, through representatives Troy Robichaux and Marva Fefee, answered Dow’s appeal and then lodged a devolutive appeal of their own. Plaintiffs’ appeal raises thirty-one assignments of error attacking the same judgment. Finally, attorney William W. Goodell, Jr., filed a separate devolutive appeal asserting five assignments of error contesting the portion of that judgment awarding him separate attorney fees and costs. After a thorough review of the extensive testimony and evidence presented at trial, the issues presented, and the applicable law, for the reasons that follow, we affirm.
I. FACTUAL BACKGROUND
This protracted litigation began in 2001 and arises out of the alleged contamination of the Plaquemine aquifer by Dow. The aquifer is a confined, fresh water aquifer located at an approximate depth of 100 to 200 feet below ground surface. It extends south from an area in southwest Mississippi to an area near White Castle, Louisiana. The Plaquemine aquifer is used as a sec *374 ondary source of drinking water for the City of Plaquemine.
Dow is a chemical manufacturing facility situated on the west bank of the Mississippi River. The northern portion of the plant is in West Baton Rouge Parish and the southern portion is in Iberville Parish. Dow is located about a mile north of Plaquemine and is situated above the Plaquemine aquifer. The facility began operation in 1958; it currently consists of twenty-three production units that manufacture more than fifty chemicals, including chlorinated solvents that, when degraded, form vinyl chloride. Dow allegedly contaminated the aquifer through various activities, including releases, spills and/or dumping of chemical precursors of vinyl chloride, which migrated into and within the aquifer.
A. Wilbert & Sons, L.L.C. (Wilbert) owned and operated the Myrtle Grove Trailer Park in Plaquemine. Wilbert provided basic services to the trailers, including hook-ups |4to two water wells he owned. Those wells pumped water from the Plaquemine aquifer for use by Myrtle Grove residents and visitors.
The Louisiana Department of Health and Hospitals (DHH) tests water systems, including water wells, for chemical and bacterial content. In 1997 and 1998, DHH tested samples from the water wells at Myrtle Grove Trailer Park and detected levels of vinyl chloride that exceeded the Maximum Contaminant Level (MCL) for that contaminant,[1] DHH sent the laboratory results to Wilbert, but neither DHH nor Wilbert notified the residents of the trailer park or anyone else of the contamination. When tests of the wells in March 2001 again revealed levels of vinyl chloride contamination beyond that which was safe for human consumption, DHH finally notified the Louisiana Department of Environmental Quality (LDEQ). LDEQ immediately began a groundwater investigation to determine the source and extent of the contamination. The United States Environmental Protection Agency (EPA) provided technical assistance to LDEQ. LDEQ took immediate action to cut off use of the contaminated water and notify residents and property owners of the problem. After the DHH reports were made public, numerous lawsuits (both class actions and individual suits) were filed by residents and visitors to the trailer park and other individuals seeking damages for the alleged groundwater contamination.
During the course of the ensuing litigation, Dow was involved in the LDEQ investigation into the cause and extent of the contaminant plume. While denying it was a source of any contaminants detected in the Plaquemine aquifer, Dow voluntarily entered into a Cooperative Agreement with LDEQ and EPA on October 6, 2004, to further evaluate the Plaquemine aquifer contamination. In that agreement, Dow committed to conduct a study of the capability of the City of Plaquemine’s water treatment facility to treat contaminants if they reached the system. Dow also agreed to perform semi-annual monitoring of nineteen wells in the Plaquemine area to observe and track the contaminant plume. Finally, the agreement required Dow to perform a | ^remediation study to evaluate the long-term need for remediation of the Plaquemine aquifer and options for remediation for the protection of public health and the environment.
Pursuant to the 2004 agreement, Dow contracted with the consulting firm Bat- *375 telle to perform a remediation study. Bat-telle evaluated remedial options in accordance with state and federal regulations and guidelines. The options evaluated included the four remediation options enumerated in the Cooperative Agreement: monitored natural attenuation (MNA), chemical injection, biostimulation, and no further action. In its final Remediation Study dated April 27, 2007, Battelle concluded that the preferred option for remediation of vinyl chloride contamination to levels at or below the MCL in the contaminated portions of the study area is MNA. In reaching that conclusion, the following factors were found to be pertinent: 1) active remediation of the vinyl chloride contamination would do nothing to improve the conventional water quality and aesthetics of the aquifer as they are generally poor due to hardness and concentrations of iron; 2) the Plaquemine aquifer in most of the remediation area is not usable for drinking water without treatment because of the presence of natural arsenic-containing minerals in the groundwater; 3) active remedies are not feasible as such a large-scale operation would require significant industrial-type activities in residential areas; [2] and 4) conditions in the Plaquemine aquifer are favorable for vinyl chloride degradation at an estimated rate that is suitable for a MNA remedy.
Following submission of the Battelle study, LDEQ issued a di’aft of a document identifying its proposed remedy for addressing the contamination of the aquifer and explaining the reasons for the preference. The document also described the remedial options considered in the Battelle study. LDEQ solicited public review and comment as to the alternatives considered. After reviewing all data and study results and considering the public input, on July 9, 2008, LDEQ and EPA issued a “Basis of Decision Document for the Final Remedy for Contamination of the Plaquemine Aquifer in the IfiVicinity of the City of Plaque-mine.” The agencies selected MNA as the most feasible remedy for the vinyl chloride contamination in the Plaquemine aquifer. The decision document stated that the final remedy would be implemented through a Cooperative Agreement or agency order.
Thus, in 2010, the parties to the 2004 Cooperative Agreement began negotiating an amended agreement, which set forth additional work to be performed by Dow. The amended agreement also contained a provision requiring Dow to implement the work plans created by Dow and approved by LDEQ and EPA to begin remediation of the Plaquemine aquifer. Finally, on January 24, 2011, Dow executed the “Amended Cooperative Agreement” that had been signed in September 2010, by representatives of LDEQ and EPA. While again denying it was a source of the contamination in the Plaquemine aquifer, Dow thereby agreed to implement a long-term monitoring plan. That action constituted one of the steps necessary to fulfill the agencies’ selection of the MNA final remedy as set forth in the agencies’ July 9, 2008 Basis of Decision document. Thereafter, as part of the regulatory process, Dow submitted a work plan to LDEQ and EPA for the implementation of MNA, which was approved by both agencies in early 2012.
II. PROCEDURAL HISTORY
The case before us involves what began as two competing class actions that were ultimately consolidated into one class, but separated into two subclasses. The first to be filed was Thomas v. A. Wilbert & Sons, *376 L.L.C.[3] The original defendants were Wilbert and DHH; Dow was later added as a defendant. The Thomas plaintiffs filed suit against Dow for causing the contamination of the Plaquemine aquifer and against Wilbert for failing to provide clean water to the residents and visitors of the Myrtle Grove Trailer Park. They also stated claims against Wilbert and DHH for failure to warn them of the presence of the chemicals in the water until 2001. All of the Thomas allegations were condensed into a single master class action petition filed on |7October 29, 2001. That petition requested relief in the form of damages for physical and mental injuries, medical monitoring, and property damage. The Thomas plaintiffs later added a claim for punitive damages.
While the Thomas action was pending, a second petition seeking class action status was filed in Iberville Parish bearing the caption Robichaux v. State of Louisiana.[4] As in Thomas, the Robichaux plaintiffs named Dow and DHH as defendants; however, they also named LDEQ and Ivy Dupree, Dow’s remediation leader.[5] They alleged that LDEQ and DHH (the State defendants) were negligent in their failures to: 1) report and warn class members of the 1997 and 1998 Myrtle Grove Trailer Park test results until 2001; 2) require and ensure remediation of the contaminated groundwater; and 3) conduct follow-up testing. As to Dow, the Robichaux plaintiffs alleged that the contamination of the groundwater and soils was due to its negligence, strict liability, and wanton and reckless misconduct. They sought injunctive relief,[6] punitive damages, and remediation of the groundwater.
Although the Thomas action was filed first, the Robichaux plaintiffs attained class certification status first. An October 18,2005 judgment specified that the claims being certified were restricted to: 1) claims for remediation pursuant to La. R.S. 30:2015.1,[7] and 2) punitive damages, except as against -the State defendants.
The Thomas plaintiffs were certified as a class two years later, in August 2007.[8] The Thomas class was comprised of four subclasses primarily differentiated by the [^damages being sought—A: personal injury, B: medical monitoring, C: property damages, or D: punitive damages—and by the class members who may be entitled to the same. The Thomas plaintiffs and all of the defendants later reached a settlement agreement concerning the A and B subclasses. To the extent that punitive dam *377 ages were derivative of those claims, the settlement dispensed with them as well.[9]
As a result, the Thomas plaintiffs were no longer pursuing any claims for bodily injury arising out of the contamination of the Plaquemine aquifer; thus, both the Thomas and Robichaux class actions became comprised solely of property owners seeking damages for the alleged conduct of Dow. As such, following the class certifications, the Thomas and Robichaux cases were consolidated and then deconsolidated several times. Finally, on March 4, 2010, pursuant to an unopposed motion to consolidate previously filed by Dow, the trial court issued a consent judgment ordering consolidation of the two lawsuits. Later, in a certification order signed on August 19, 2010, the trial court defined the class as being comprised of:’
All persons or entities who or which sustained damages to their real property since 1985 due to the vinyl chloride, its successors or derivates [sic] in the Plaquemine Aquifer. The class consists of all persons and entities having a prop- ■ erty interest in the affected area.
The class definition was specified to include the following subclasses:
The Thomas Sub Class includes anyone who currently owns or owned, at any time from January 1, 1985, land in the Class Area. This Sub Class is asserting claims for property damage and trespass and is seeking both punitive and money damages based upon allegations that Dow committed a subsurface trespass on the property owned by the members of the Class.
The Robichaux Sub Class includes anyone who currently owns or owned, at any time from January 1, 1985, land in the Class Area. This Sub Class is seeking remedies allowed under the Groundwater Act (La. R.S. 30:2015.1) for evaluation and remediation of any contamination caused by Dow that impacts or threatens usable groundwater. This Sub Class is also asking for punitive damages.
Importantly, the class members themselves are identical in both subclasses.
Pending the final negotiation of settlement terms, on December 14, 2010, in open court, the Thomas subclass and Dow filed a joint motion to continue without date | nail deadlines applicable to the Thomas claims, including all pending motions and the trial that was set to begin on January 11, 2011. Thereafter, following completion of the necessary procedural requirements, the Thomas subclass ultimately settled all of its claims against Dow and, on July 20, 2011, the trial court signed a “final order and judgment” approving the settlement; the judgment was designated as appealable, but no appeal was taken.
A number of motions in the Robichaux matter also came before the trial court for hearing on December 14, 2010, including a motion for partial summary judgment on the issue of punitive damages filed by defendants Dow and Ivy Dupree. They asserted the Robichaux plaintiffs were not entitled to claim punitive damages when their compensatory damage claim was limited to a claim for the remediation of usable groundwater under the Groundwater Act. Following the hearing, by judgment dated December 16, 2010, the trial court granted the motion, striking the Robi-chaux plaintiffs’ punitive damages claims with prejudice. They applied for writs with this court, which we granted on review, reversing the trial court. Thereafter, the supreme court denied defendants’ writ ap *378 plication, finding they have an adequate remedy on appeal.[10]
On remand, the parties agreed to bifurcate the punitive damages claims for possible later trial.[11] Accordingly, the Robi-chaux plaintiffs proceeded to trial on their groundwater remediation claims. A twenty-five day bench trial was held in January and February 2011. At the conclusion of the Robichaux plaintiffs’ case, defendant Ivy Dupree was dismissed from the case with prejudice pursuant to a motion for involuntary dismissal. Thereafter, following closing arguments on April 21, 2011, the trial court took the matter under advisement. On June 20, 2011, the trial court issued a judgment, finding by a preponderance of the evidence as follows:
• The Groundwater Act is the controlling law as to this litigation;
|1ft* The only claim asserted in this litigation is one for remediation of the Upper Plaquemine Aquifer (UPA);
• The conduct of Dow constitutes negligence;
• Dow is at least one of the parties responsible for the contamination of “usable groundwater” as defined by the Groundwater Act;
• The condition of the UPA constitutes a threat to the public health under the provisions of La. R.S. 30:2015.1; Dow is at least one of the parties responsible for the contamination that poses a threat to the public health; - Evaluation and/or remediation of the usable groundwater is required by the Groundwater Act;
• Dow is legally responsible to plaintiffs for the claims asserted, and the law and evidence are in favor of the plaintiffs and against Dow;
• The most feasible plan for remediation of the contamination and to protect the usable groundwater consistent with the health, safety, and welfare of the people is MNA.
After the trial court’s June 20, 2011 initial judgment on liability, post-trial hearings were held to address three separate issues. First, a five-day deposit hearing took place in April and September 2012, for the purpose of establishing the amount of funds Dow would be required to deposit in the court’s registry to cover the estimated cost of implementing the court’s chosen remedy of MNA. Next, pursuant to a motion for award of attorney fees and reimbursement of litigation costs and expenses filed by Robichaux class counsel, the trial court held evidentiary hearings over eight days from April through early October 2012, then took the matter under advisement. Last, on July 19, 2012, the trial court conducted a hearing on the issue of prejudgment interest as pertains to both the remediation award and the award of attorney fees, after which the court took that matter under advisement as well.
Thereafter, on May 22, 2013, the court signed a “Final Judgment” in the Robi-chaux matter. The lengthy judgment references prior judgments and rulings and details final dispositions in the class action regarding liability and remediation, attorney |ufees and costs, and interest. Importantly, the trial court declared that: 1) contamination exists in the class area that poses a threat to public health as to which evaluation or remediation is required to protect usable groundwater; 2) Dow is a *379 “responsible party” under La. R.S. 30:2015.1; and 3) MNA is the most feasible plan for remediation of the contamination and for protection of usable groundwater consistent with the health, safety and welfare of the people.
With regard to the deposit hearing, the final judgment notes the trial court forwarded its June 20, 2011 ruling selecting the MNA remedy to LDEQ. The final judgment declared that LDEQ and EPA “possess experience, knowledge, skill and expertise in the field of groundwater remediation and that the decisions of LDEQ and USEPA concerning the MNA remedy for the Upper Plaquemine Aquifer and the implementation of the MNA remedy are entitled to deference.” The court adopted and decreed that Dow shall implement the MNA remedy as set forth in the November 18, 2011 “Implementation Plan for the Monitored Natural Attenuation Remedy for the Plaquemine Aquifer Near Plaquemine, Louisiana,” as conditionally approved by LDEQ and EPA on January 17, 2012. The trial court ordered Dow to pay directly the costs of implementing the MNA remedy and procure a performance bond for the entire $3.2 million estimated cost of the remedy.
Also in the final judgment, the trial court granted in part and denied in part class counsels’ claim for attorney fees and costs.[12] All claims for prejudgment interest were denied. The court retained jurisdiction over the action until remediation is completed. Finally, finding that there was no just reason for delay, the trial court designated the judgment as final pursuant to La. C.C.P. art. 1915.[13]
Dow suspensively appealed the May 2013 judgment pursuant to an order of appeal signed on October 25, 2013, and posted a bond of $9.7 million. The Robi-chaux 11 .^plaintiffs answered Dow’s appeal and then lodged a devolutive appeal of their own from both the May 22, 2013 final judgment and a partial summary judgment signed on October 11, 2011, dismissing their punitive damages claims with prejudice.[14] On November 25, 2013, attorney William W. Goodell, Jr. was granted a separate devolutive appeal from that portion of the May 22, 2013 final judgment that partially granted and partially denied his claim for attorney fees and costs.
III. LEGAL PRECEPTS

A. Standard of Review

It is well-settled that a reviewing court may not disturb the factual findings of the trier of fact in the absence of manifest error.[15] The Louisiana Supreme Court has set forth a two-part test for the appellate review of facts: 1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court; and 2) the appellate court must further determine that the record establishes the finding is not clearly wrong or manifestly erroneous.[16] If the trial *380 court’s findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.[17] Consequently, when there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.[18]

B. The Groundwater Act

The Groundwater Act, La. R.S. 30:2015.1, sets forth the applicable procedures to be employed in cases involving the remediation of usable groundwater. It states as follows:
|1SA. The legislature hereby finds and declares that Article IX, Section 1 of the Constitution of Louisiana mandates that the natural resources of the state, including water, are to be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people and further mandates that the legislature enact laws to implement this policy.
B. Notwithstanding any law to the contrary, upon the filing of any litigation, action, or pleading by any plaintiff in the principal demand, or his otherwise making a judicial demand which includes a claim to recover damages for the evaluation and remediation of any contamination or pollution that is alleged to impact or threaten usable ground water, such plaintiff filing same shall provide written notice by certified mail, return receipt requested, which notice shall contain a certified copy of the petition in such litigation, to the state of Louisiana through the Department of Environmental Quality. To the extent that any such litigation or action seeks to recover for the evaluation and remediation of any contamination or pollution that is alleged to impact or threaten usable ground water, the Department of Environmental Quality, in accordance with its respective areas of constitutional and statutory authority and regulations adopted pursuant thereto, shall have the right to intervene in such litigation or action in accordance with the Louisiana Code of Civil Procedure. The department shall not have the right to independently assert a plea for damages to usable ground water beyond that stated by the plaintiff in the principal demand. However, nothing in this Section shall dimmish the authority of the department from independently bringing any civil or administrative enforcement action. No judgment or order shall be rendered granting any relief in such litigation, nor shall the litigation be dismissed, without proof of notification to the state of Louisiana as set forth in this Subsection.
C. (1) If, prior to judgment on the merits, a party admits responsibility or the court makes a determination that contamination of usable ground water exists which poses a threat to the public health, and that evaluation or remediation is required to protect usable ground water and determines the responsible party, the court shall either order the responsible party or a court-appointed expert to develop a plan for evaluation or remediation of the contamination. The court shall also consider any plan submitted by the plaintiff. The court shall order the Department of Environmental *381 Quality to respond to any plan submitted within sixty days from the date of submission.
(2) Within sixty days of the submission of a plan as provided in Paragraph(C)(l) of this Section, any other party may file written objections to or request modification of the plan or submit an alternative plan. If proposed modifications to the plan or an alternative plan is filed by any other party, the court shall order the Department of Environmental Quality to respond within sixty days from the date of submission.
(3) After hearing, the court shall adopt or structure a plan which the court determines to be the most feasible plan to evaluate and remediate the contamination and protect the usable ground water consistent with the health, safety, and welfare of the people. Upon adoption of the plan, the court shall order the responsible party to fund implementation of the plan and shall order the estimated cost of implementation deposited in the registry of the court.
| u(4) No plan shall be adopted by the court without the court having provided the Department of Environmental Quality an opportunity to provide input into the formulation of the plan and without the court having given consideration to any input provided by the department. D. After a trial on the merits, if the court makes a determination that contamination exists which poses a threat to public health as to which evaluation or remediation is required to protect usable ground water and determines the party responsible, the court shall render judgment adopting the plan which the court determines is the most feasible plan to evaluate or remediate the contamination and protect the usable ground water consistent with the health, safety, and welfare of the people. To the extent the judgment requires the evaluation or remediation to protect usable ground water, the court shall order the responsible party to deposit the estimated cost to implement the plan in the registry of the court. The court shall order the Department of Environmental Quality to respond to any plan submitted within sixty days from the date of submission. No plan shall be adopted by the court without the court having provided the Department of Environmental Quality an opportunity to provide input into the formulation of the plan and without the court having given consideration to any input provided by the department.
E. (1) Whether or not the Department of Environmental Quality becomes a party, and except as provided in Subsection I of this Section, all damages or payments in any civil action, including interest thereon, awarded for the evaluation and remediation of contamination or pollution that impacts or threatens to impact usable ground water shall be paid exclusively into the registry of the court as provided in this Section.
(2) The district court may allow any funds to be paid into the registry of the court to be paid in increments as necessary to fund the evaluation and remediation. In any instance in which the court allows the funds to be paid in increments, whether or not an appeal is taken, the court shall require the posting of a bond for the implementation of the plan of remediation in such amount as provided by and in accordance with the procedures set forth for the posting of suspensive appeal bonds.
(3) The court shall issue such orders as may be necessary to ensure that any such amount is actually expended for the evaluation and remediation of the contamination of the usable ground water *382 for which the award or payment is made.
(4) In all such cases, the district court shall retain jurisdiction over the funds deposited and the party cast in judgment until such time as the evaluation and remediation is completed. The court shall, on the motion of any party or on its own motion, order the party cast in judgment to deposit additional funds into the registry of the court, if the court finds the amount of the initial deposit insufficient to complete the the [sic] evaluation or remediation and, upon completion of the evaluation and remediation, shall order any funds remaining in the registry of the court to be returned to the depositor.
F.(1) In any civil action in which a party is adjudicated responsible for damages or payments for the evaluation and remediation of contamination or pollution that impacts or threatens to impact usable ground water, the party or parties providing evidence, in whole or in part, upon which the judgment is based shall be entitled to recover from the | Hearty cast in judgment, in addition to any other amounts to which they may be entitled, all costs, including expert witness fees and reasonable attorney fees attributable to producing that portion of evidence that directly relates to the claims of contamination or pollution that impacts or threatens to impact usable ground water.
(2) In any civil action in which the Department of Environmental Quality or its employees are parties or witnesses, provide evidence, or otherwise contribute to the determination of responsibility or evaluation or remediation, such agency shall be entitled to recover from the party cast in judgment all costs, including evaluation and review costs, expert witness fees, and reasonable attorney fees.
G. Any judgment adopting a plan of evaluation or remediation of usable ground water pursuant to this Section and ordering the responsible party to deposit funds for the implementation thereof into the registry of the court pursuant to this Section shall be considered a final judgment pursuant to the Code of Civil Procedure for purposes of appeal. The review or appeal of any judgment which consists in whole or in part of an order adopting a plan of evaluation or remediation of usable ground water shall be heard with preference and on an expedited basis.
H. The provisions of this Section are intended to ensure evaluation and remediation of usable ground water. When the court does not find contamination or pollution or a threat of contamination or pollution to usable ground water, the court may dismiss the Department of Environmental Quality from the litigation.
I. This Section shall not preclude an owner of land from an award for personal injury or damage suffered as a result of contamination that impacts or threatens usable ground water. This Section shall not preclude an owner of land from an award for damages to or for remediation of any other part of the surface or subsurface of his property and any award granted in connection therewith shall not be paid into the registry of the court, but shall be made directly to the owner of the land. This Section shall not preclude a judgment ordering damages for or implementation of additional remediation in excess of the requirements of the Department of Environmental Quality as may be required in accordance with the terms of an expressed or implied contractual provision. This Section shall not be interpreted to create any cause of action.
*383 J. For the purposes of this Section, the following terms shall have the following meanings:
(1) “Usable ground water” shall mean any 'ground water defined as Groundwater Classification I or Groundwater Classification II under the terms of the Risk Evaluation Corrective Action Program (RECAP) regulations promulgated by the Louisiana Department of Environmental Quality and in effect on January 1, 2003.
(2) “Evaluation and remediation” shall include but not be limited to investigation, testing, monitoring, containment, prevention, or abatement.
K The Department of Environmental Quality shall establish rules and procedures for the receipt, evaluation, and approval or modification of plans for evaluation or remediation. The rules established by the agency 11fishall be based upon risk-based standards sufficient to protect human health and the environment.
L. This Section shall not apply to oilfield sites or exploration and production (E&P) sites regulated by the Department of Natural Resources, office of conservation, “Oilfield site” or “exploration and production (E&P) site” means any oilfield site or exploration and production site as defined in R.S. 30:29(I)(4).
IV. DISCUSSION
While the three appeals that are before this court present a total of thirty-eight assignments of error for our review, they all involve the propriety of the trial court’s rulings pertaining to three central issues: remediation, punitive damages, and attorney fees/costs. As such, the assignments of error will be addressed under the umbrella of one of those main concerns.

A. Remediation

In its suspensive appeal, Dow contends the trial court erred in entering judgment in plaintiffs’ favor under the Groundwater Act for two separate and independent reasons: 1) the Act does not create any independent cause of action for remediation and plaintiffs failed to assert, let alone prove, any other cause of action against Dow; and 2) plaintiffs failed to establish an injury that constitutes a threat to public health, a prerequisite to obtaining remediation under the Act. In their devolutive appeal, the Robichaux plaintiffs contest numerous aspects of the trial court’s application of the Groundwater Act and its adoption of MNA as the most feasible plan. Some twenty of their assigned errors are so devoted. We thus find it suitable to further break down the general issue of remediation into three subcategories as follows.

1. Cause of action

Dow first claims that the trial court erred in entering judgment in plaintiffs’ favor under the Groundwater Act because the Act does not create an independent cause of action for remediation and plaintiffs failed to assert, let alone prove, any other cause of action against Dow. Dow emphasizes that the two subclasses designated here are comprised of the same individuals. It settled with the Thomas private damages subclass, leaving only the claims of the Robichaux remediation subclass for trial. Dow 117argues the remediation claim thus fails as a matter of law. Remediation is merely a remedy—according to Dow, plaintiffs must still prove an underlying cause of action, such as contract or tort, to trigger imposition of this remedy. The Groundwater Act specifically states that it does not create a separate cause of ac *384 tion.[19] Dow claims the Robichaux subclass pursued a single remediation remedy, but failed to attach that remedy to a substantive claim.
Dow further asserts that plaintiffs must prove individual harm; in other words, groundwater contamination alone does not trigger the Groundwater Act. Here, Dow asserts, the Robichaux remediation plaintiffs failed to prove they suffered actual and compensable damages, as those private law claims were settled by the Thomas subclass. Dow insists it was incumbent upon plaintiffs to allege, and prove, actual personal damages regardless of the theory of recovery advanced. In this case, plaintiffs did not prove they own or even attempted to capture the groundwater; as such, Dow argues, plaintiffs failed to prove individual harm to their property ownership.
While the Robichaux plaintiffs agree that the Groundwater Act does not create a remediation cause of action, they assert their claim for remediation is based on tort, property law, and mineral law. Plaintiffs set forth claims that are predicated upon specific provisions of the La. Civil Code and the Mineral Code, They point out that the trial court specifically found Dow was negligent in its June 20, 2011 interlocutory judgment. Although the Thomas subclass settled them claim for tort damages, the underlying assertion that Dow’s negligence contributed to the contamination of the aquifer forms the basis of the Robichaux plaintiffs’ claim for remediation damages. Plaintiffs maintain that they specifically pled all causes of action available to them under the Civil Code and the Mineral Code that are supported by the facts. Further, they argue they alleged and proved that they personally sustained damages as a result of Dow’s contamination of the usable groundwater underlying their property.
| isln this case, since there existed no contract between any member of the Robi-chaux subclass and Dow, any remedy the subclass has against Dow for damages to their property must necessarily involve tort and/or property principles. Here, plaintiffs’ claims for damages to usable groundwater arise under La. C.C. Art. 2315, La. C.C. Art. 667, and/or La. R.S. 31:10.[20] Accordingly, we must analyze each of these theories of civil responsibility in the context of groundwater contamination.
In the exercise of the prerogatives of ownership in immovable property, use of property by a landowner may cause damage to neighboring landowners and to members of the general public. “In civil law systems, various provisions of public and private law impose on landowners ... certain obligations the violation of which may entrain civil responsibility toward authorities, landowners, or members of the general public.” Responsibility may arise in the framework of vicinage under both the law of delictual obligations and under rules of property law.[21]
*385 The law of delictual obligations, La. Civ. Code Art. 2315, authorizes actions for the reparation of damages to property and injuries to persons.[22] Distinct from the law of delictual obligations are those that arise under property law. La. Civ. Code Art. 667 provides that no one may use his property so as to cause damage to another or to interfere substantially with the enjoyment of another’s property.[23] While Louisiana courts have expressed divergent views concerning the nature of a person’s responsibility under article 667, the prevailing view is that an article 667 action “is not one in tort, but, rather one that springs from an obligation imposed upon property 11flowners by the operation of law so that all may enjoy the maximum of liberty in the use and enjoyment of their respective properties.”[24]
Although clearly focused on the petroleum industry, the Mineral Code, enacted in 1975, specifically includes groundwater within its ambit.[25] It has express provisions of law concerning neighboring mineral rights that parallel the conventional property law found in article 667 of the Civil Code.[26] The Mineral Code provides that landowners have the exclusive right to explore for and remove water from the land and to reduce it to possession and ownership.[27] Article 8 of the Mineral Code addresses a landowner’s right of enjoyment for mineral extraction and sets forth the so-called “rule of capture.”[28] It states:
A landowner may use and enjoy his property in the most unlimited manner for the purpose of discovering and producing minerals, provided it is not prohibited by law. He may reduce to possession and ownership all of the minerals occurring naturally in a liquid or gaseous state that can be obtained by operations on or beneath his land even though his operations may cause their migration from beneath the land of another.[29]
Article 10 of the Mineral Code further provides:
A person with rights in a common reservoir or deposit of minerals may not make works, operate, or otherwise use his rights so as to deprive another intentionally or negligently of the liberty of enjoying his rights, or that may intentionally or negligently cause damage to him. This Article and Article 9 shall not *386 affect the right of a landowner to extract liquid or gaseous minerals in accordance with the principle of Article 8.[30]
IsnThe comments to Article 10 state:
Article 10 is a limited restatement of the obligation of good neighborhood contained in Article 667 of the Louisiana Civil Code. It views the relationship between those with rights in a common source of supply as one of neighborhood. It is to be noted that the phrasing of Article 10 is both broader and more limited than that of Article 667 of the Civil Code, which merely states that a proprietor may not “make any work ..,, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of damage to him.” Article 10, however, provides that one owning rights in a common source supply of minerals may not “make works, operate, or otherwise use his rights so as to deprive another of the liberty of enjoying his rights or that may cause damage to him.” The intent is to assure that the article will not be limited in its application to making works as such but will govern the entire range of exploratory and extractive activities in a common source of supply of minerals.
The applicability of the principle of Article 667 of the Civil Code to mineral matters in Louisiana is sustained in the case of Higgins Oil & Fuel Co. v. Guaranty Oil Co., 145 La. 233, 82 So. 206 (1919), in which a landowner left a well uncapped to decrease the pumping efficiency of his neighbor’s well. An injunction was granted against such conduct. See also Adams v. Grigsby, 152 So.2d 619 (La. App. 2d Cir. 1963).
In Anglo-American jurisdictions oil and gas decisions have granted relief for waste of the common resource resulting from various causes. See Kuntz, “Correlative Rights of Parties Owning Interest in a Common Source of Supply of Oil and Gas,” 17th Inst. on Oil and Gas Law and Taxation, 229 et seq. (1966). Relief has also been granted where an attempt was made to disguise waste beneath the cover of a sham, low magnitude economic utilization of resources. Louisville Gas Co. v. Kentucky Heating Co., 117 Ky. 71, 77 S.W. 368 (1903). Similarly, an owner of rights in a common source of supply has been protected against negligent waste of the common resource, as for example by a blowout which due care could prevent. Elliff v. Texon Drilling Co., 146 Tex. 575, 210 S.W.2d 558 (1948). There does not, however, seem to be any instance to date in which courts have been willing to impose liability for waste of the common source of supply without either intent or negligence. This reflects a determination that the public interest in utilization of the resources is such that the ordinary risks of waste occasioned by occurrences which are not the result of intent or negligence should not be shifted from one party engaged in extraction to others engaged in the same utilitarian endeavor. It is in this sense, in view of the general jurisprudence, that Article 10, of the Mineral Code is more limited than Article 667 of the Civil Code. Under Article 10, the obligations of those having correlative rights in a common source of minerals result in liability only if damage is intentionally or negligently caused. The fact that ordinary risks have not been shifted among those engaged in extraction does not, however, mean that relief cannot be granted if, once an event has taken place, an operator does not take reasonable steps to remedy a situation resulting in waste. If, for example, a produc- *387 mg formation is menaced by a blowout resulting from an unavoidable accident causing waste of the common resource, the operator suffering the accident cannot fail to take all necessary and reasonable measures to minimize the damage to other interests in the common source of supply. Larkins-Warr Trust Co. v. Watchorn Petroleum Co., 198 Okla. 12, 174 P.2d 589 (1946).
121Other cases in Anglo-American jurisdictions have dealt with spoilage of the common reservoir. For example, excessive rates of withdrawal causing intrusion of water in the producing formation, Manufacturers’ Gas and Oil Co. v. Indiana Natural Gas & Oil Co., 155 Ind. 461, 57 N.E. 912 (1900); failure to plug an abandoned well, permitting intrusion of water, Atkinson v. Virginia Oil & Gas Co., 72 W.Va. 707, 79 S.E. 647 (1913); and negligence in “shooting” a well, Comanche Duke Oil Co. v. Texas & Pacific Coal Co., 298 S.W. 554 (Tex.Comm.1927), have all been situations warranting relief. These types of conduct can cause damage either to production or energy rights or both.
Modern techniques of pressure maintenance and secondary recovery are beginning to cause problems in other jurisdictions. In one instance, water flood operations deprived an owner of his right to primary production, and relief was granted. Tidewater Oil Co. v. Jackson, 320 F.2d 157 (10th Cir.1963).
This brief review of cases involving correlative rights in other jurisdictions is not intended to suggest that the Louisiana Supreme Court must necessarily adopt the holding of any or all of those cases as a result of the enactment of Article 10. The review is given merely to point out the general nature of the doctrine of correlative rights and the types of interests which have been protected in other states. It is believed that this article furnishes the necessary flexibility to Louisiana courts to deal with problems of correlative rights in a common source of supply of oil, gas, or other minerals in Louisiana, and it is thus intended that this device be used to make it clear that correlative rights of those with interests in a common source are protected.
It should be noted that if by exercise of the policy power the correlative rights of the parties are regulated or fixed by an administrative agency, the rule of private property in Article 10, limiting liability to intentionally, or negligently caused damage would not excuse the party for violation of the regulatory order.
The reference to Article 8 is intended to assure that although the obligation of neighborhood exists, the so-called “rule of cápture” as stated in Article 8 will not be infringed by application of Articles 6 and 7. Thus, a landowner conducting lawful operations on his own property is not in violation of his obligation of good neighborhood simply because some of the fugitive minerals that he recovers may have been drawn from beneath land belonging to another. It should be noted, however, that the Louisiana Supreme Court has held that although the rule of capture protects a landowner or one procuring rights from him in reducing minerals to possession even though migration from the land of another may result, if intentional or-negligent conduct damages the property values of another as a result of waste of the common source of supply, the party damaged has a cause of action for such diminution of his property value. McCoy v. Arkansas Natural Gas Co., 175 La. 487, 143 So. 383 (1932).
The rule of capture is not applicable to solid minerals. Article 13 provides that a *388 landowner may recover for unauthorized withdrawal of such minerals “by any means.” Therefore, the limiting words of Article 10 referring to Article 8 are applicable only to the fugitive minerals.
|22We interpret the provisions of La. R.S. 31:10 and the comments thereto as lending sufficient authority for the proposition that one who damages another’s enjoyment of the right to extract minerals from his property may be held liable for damages therefor.[31]
While the various provisions just discussed establish distinct grounds of responsibility, we find it unnecessary here to distinguish between them.[32] We conclude that Dow’s negligence in contaminating the aquifer amounted to violations of the duties set out by Civil Code Article 667 and the Mineral Code’s article 10, which in turn constitutes “fault” within the meaning of article 2315. Courts often search for and seek to apply a certain theory of recovery “in cases in which theory is essential for the resolution of a particular controversy.”[33] Such is not the case here. Allegations and proof of any one of these theories of recovery are sufficient to trigger and support imposition of the remedy here imposed. We find that the Robichaux plaintiffs sufficiently pled and proved an underlying cause of action based on general tort principles and property law, which entitle them to the remedy of remediation. Accordingly, Dow could be held liable to the Robichaux plaintiffs for damaging their right to capture groundwater from the Plaquemine aquifer situated below their land.
We reject Dow’s argument that damages can be recovered only for groundwater actually reduced to possession. We find the Robichaux plaintiffs are entitled to relief where Dow, by its negligent actions, caused the contamination of plaintiffs’ water supply, rendering it unfit for their use. It matters not that plaintiffs have not attempted to reduce the water to their possession; clearly, Dow’s negligence has interfered with their right to do so. We find that contamination of the aquifer’s usable groundwater, in l^itself, constitutes individual harm regardless of whether there has been an effort to capture the groundwater for private use. Landowners possess an inchoate right to do so; Dow’s negligence has effectively prevented the exercise of their right to capture the groundwater. Dow’s assignment of error has no merit

2. Threat to public health

Dow also asserts the Robichaux plaintiffs are not entitled to remediation under the Groundwater Act because they failed to prove contamination of the aquifer poses a threat to public health. Section D of the Act requires plaintiffs to prove: 1) contamination exists, 2) the contamination poses a threat to public health as to which evaluation or remediation is required to protect usable ground water, and 3) who is the party responsible.[34] In sup *389 port of its argument, Dow notes it introduced as evidence two reports prepared by the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency of the U.S. Department of Health and Human Services. The agency specifically examined whether exposure to the contaminated groundwater in the Plaquemine aquifer could result in adverse health effects. In both reports, it concluded the contamination poses no apparent public health hazard.
The record establishes that in August 2001, after vinyl chloride was detected in the Myrtle Grove Trailer Park well system where the aquifer had been used as a drinking water source, the community petitioned the ATSDR for a public health assessment of the site. ATSDR reported the results of its investigation in a May 17, 2004 Health Consultation. In that report, ATSDR concluded that although exposure to water that contained vinyl chloride and other volatile organic chemicals occurred, “the levels of the chemicals detected were below levels likely to result in adverse health effects.” As such, ATSDR categorized the Myrtle Grove Trailer Park site as presenting no apparent public health hazard.
ATSDR then looked at a larger area of potential contamination and collected available groundwater sampling data for twenty-four active wells identified by LDEQ to _|^be within the contamination plume area. Thirteen of those active wells had detectable levels of chemicals, including vinyl chloride. In a December 11, 2006 Health Consultation, ATSDR concluded, “Under site-specific exposure conditions ... exposure to the water from the 13 active Plaquemine area wells is unlikely to result in harmful health effects.”
In response, the Robichaux plaintiffs contend the trial court’s finding that the contamination of the aquifer poses a threat to public health was not manifestly erroneous. Dow offered no expert testimony on the subject, relying strictly on the ATSDR reports, while the Robichaux plaintiffs retained as an expert Dr. Paul H. Templet, who is a Ph.D. chemist/physicist. Dr. Tem-plet taught environmental management for 25 years at LSU and was Secretary of LDEQ from 1988 through 1992, where he was heavily involved in making decisions that affected public health, safety, and the environment. Dr. Templet was qualified as an expert in environmental planning and management, environmental chemistry, application of environmental regulations, and risk assessment and analysis.
Dr. Templet testified at trial that an MCL is the maximum contaminant level allowed under the Safe Drinking Water Act. An MCLG is EPA’s goal in setting the MCL—it is defined as the level of contaminant in drinking water below which there is no known or expected risk to health. The MCLG for vinyl chloride is zero, while the actual MCL is 2 parts per billion (ppb). Dr. Templet stated unequivocally that contamination in a drinking water aquifer that is above the MCL necessarily constitutes a risk to public health. The standards are promulgated based on public health—“[i]f you exceed the standards, then there is a threat to public health.”
The Robichaux plaintiffs assert that Dow’s reliance on the ATSDR reports is misplaced. As Dr. Templet explained at trial, the ATSDR. used a “very narrow approach” in calculating the risk to people who drank the water that was contaminated with vinyl chloride. Dr. Templet disagreed with some of the agency’s assumptions. For instance, the agency assumed that “no one will ever drink this water again, that this aquifer is taboo, it’s off limits.” Dr. Templet stated that assumption is very bad management | gKpractice. *390 He opined that the only way the ATSDR could come to the conclusion that the aquifer is safe for the public is to say it is off limits—to condemn the aquifer essentially. Dr. Templet felt that, looking at ATSDR’s recommendations, they were not employing a management strategy; rather, they had a “let’s close down the aquifer and not have people use the water strategy” and in that way “reduce the threat to human health for those people living there.” In other words, in Dr. Templet’s opinion, the only way ATSDR could reduce the risks at the Myrtle Grove Trailer Park to a level within what it considered manageable bounds was “to shut down the aquifer and not allow people to use it now or in the future.”
The 2006 ATSDR study involved a larger area of potential contamination—the entire Plaquemine area, as opposed to only the Myrtle Grove Trailer Park that was considered in the 2004 study. At that time, only one well was used for drinking water and, when tested, did not have vinyl chloride in it. Regardless, Dr. Templet stressed that ATSDR admitted there is contamination of the aquifer. He stated, “It’s roulette to assume that they won’t have contamination at some point in the future.” When questioned about the fact that some of the wells in the ATSDR test area were “non-detect” for vinyl chloride, Dr. Templet responded, “The source [of the contamination] is still there, it’s probably moving, there’s contamination that’s going to occur in the future, and you can’t expect people not to drill wells.”
Dow notes that plaintiffs’ expert, Dr. Templet, provided the only response to the ATSDR reports. According to Dow, Dr. Templet opined that a threat to public health existed solely because some of the data from the Plaquemine aquifer wells revealed contamination levels that exceeded the MCL established by the EPA. As the 2004 ATSDR report explains, health-based comparison values such as MCLs “represent conservative levels of safety and not thresholds of toxicity. Thus, although concentrations at or below a comparison value may reasonably be considered safe, concentrations above a comparison value will not necessarily be harmful.” In other words, exceeding an MCL level does not automatically translate to a public threat. Dow argues the trial court’s acceptance of Dr. Templet’s “blind reliance on the MCL” as ^Insufficient proof that contamination of the Plaquemine aquifer poses a threat to public health under the Groundwater Act was manifestly erroneous.
As noted by the Robichcmx plaintiffs, Dow failed to introduce expert testimony on the issue of a public health threat, relying solely on the ATSDR reports. Plaintiffs introduced the expert testimony of Dr. Templet, who questioned ATSDR’s assumptions and voiced strong contrary opinions. After reviewing all of the evidence presented on this issue, we find no manifest error in the trial court’s obvious acceptance of Dr. Templet’s testimony. His testimony offers clear support for the conclusion that contamination of the Plaque-mine aquifer poses a threat to public health sufficient to implicate application of the Groundwater Act. Where two permissible views of the evidence exist, the factfin-der’s choice between them cannot be manifestly erroneous.[35] We find no merit in Dow’s assertions on this issue.

3. Most feasible plan

*391 In numerous assignments of error,[36] the Robichaux plaintiffs challenge various aspects of the trial court’s determinations surrounding adoption of the most feasible plan to remediate the Plaquemine aquifer. These assignments will be grouped and addressed together when possible according to the issues raised.

a. Groundwater Act procedures

First, plaintiffs assert the trial court erred in failing to follow the procedures of the Groundwater Act in its adoption of the feasible plan. At the conclusion of the trial on the merits, in its June 20, 2011 judgment, the court found the most feasible plan is MNA. Plaintiffs argue the explicit procedures outlined in Subsection C of the Groundwater Act dictate that the trial court conduct a feasible plan hearing before making that decision. Thus, they assert, they “had no reason to believe that the | ^selection of the feasible plan would be made based on the evidence adduced at the trial on the merits.”
Dow counters that the applicable section of the Groundwater Act is Subsection D, which is what the trial court specifically followed. We agree. Subsection C of La. R.S. 30:2015.1 applies when a party admits responsibility or the court determines liability “prior to judgment on the merits,” whereas Subsection D applies when liability is determined “[ajfter a trial on the merits,” It specifies that the trial court shall then “render judgment adopting the plan which the court determines is the most feasible plan to evaluate or remediate the contamination and protect the usable ground water consistent with the health, safety, and welfare of the people.”[37]
We agree with Dow and find no procedural violation in this case. Further, we find no merit in plaintiffs’ assertions they were unaware that a feasible plan would be selected based on evidence presented at trial. Indeed, they presented the testimony of numerous witnesses, the foremost being their expert, Brent Bray, who testified at length concerning his belief that MNA could not be implemented successfully. Accordingly, Mr. Bray proposed several alternatives including a containment and pump and treat plan. Further, the Ro-bichaux plaintiffs introduced extensive documentary evidence in support of their chosen method of remediation and its purported cost. Plaintiffs’ arguments in this regard lack merit.

b. Scope of the deposit hearing

Subsection D of the Groundwater Act provides that, after a trial on the merits, to the extent a judgment requires remediation to protect usable groundwater, “the court shall order the responsible party to deposit the estimated cost to implement the plan in the registry of the court.”[38] Accordingly, following the trial court’s June 20, 2011 initial judgment on the issue of liability, the court ordered that another hearing be held pursuant to the Groundwater Act “for the purpose of establishing the amount and in 128what increment said funds should be deposited in the Court’s registry” to cover the costs of implementing the court’s chosen remedy of MNA.
In response to Dow’s discovery requests, plaintiffs identified an extensive list of witnesses, including numerous experts, they *392 may call at the deposit hearing. Concerned about plaintiffs’ view of the scope of the hearing, Dow filed a post-trial motion for a protective order and to exclude evidence unrelated to the cost of MNA, Dow argued that the majority of plaintiffs’ proposed witnesses had nothing to offer on the costs of implementing MNA, thus evidencing plaintiffs’ true intent to use the hearing to retry their remediation case. According to Dow, plaintiffs intended to challenge the trial court’s adoption of MNA in an attempt to have the court order Dow to fund a pump and treat remedial strategy, even if on a contingency basis.[39] Dow urged that, not only had those issues been fully litigated and decided, they were irrelevant to the cost of implementing the MNA plan adopted by the trial court.
Following a hearing, by judgment dated November 21, 2011, the trial court granted Dow’s motion and restricted the scope of the deposit hearing to: 1) the scope of work needed to implement MNA; 2) the schedule for implementing MNA; and 3) the costs of implementing MNA. Dow subsequently filed a motion to exclude the opinions and testimony of two of plaintiffs’ expert witnesses, Dr. Joseph Hughes and Dr. James Bruya. It argued that neither witness would offer an opinion that even remotely pertained to the cost of implementing the MNA remedy. The trial court apparently agreed and rendered judgment on February 20, 2012, excluding their testimony from the deposit hearing. The court also specifically excluded any and all evidence and testimony concerning:
(a) the likelihood that any contingency action or remedy will need to be implemented; and (b) the estimated cost of any contingent remedies or contingency actions, including but not limited to (1) the actions described in the “Contingency Plan” section of Dow’s proposed Implementation Plan, (2) the contingency actions or remedies proposed in any competing implementation plan submitted by the Plaintiffs, and/or (3) any conveyance notices or similar contingent institutional controls.
12aIn multiple, at times redundant, assignments of error, the Robichaux plaintiffs complain of the “extreme evidentiary restrictions” the trial court imposed at the deposit hearing. They argue the trial court erroneously excluded critical evidence that was relevant to the ultimate cost of the feasible plan. Specifically, plaintiffs assert it was error to exclude: the testimony of Dr. Hughes concerning insufficient monitoring, evidence that more robust institutional controls (such as conveyance notices) should be required and the cost of the same, evidence of the cost of the institutional controls included in the plan adopted, and evidence concerning the nature and cost of their proposed pump and treat contingency plan.
In excluding certain evidence and in restricting the scope of the deposit hearing, the trial court evidently agreed with Dow’s arguments that the Robichaux plaintiffs intended to mount an “end-run attack on the viability and feasibility of the MNA remedy” the court had already ordered. We note this intent is likewise evident in the arguments plaintiffs present in the instant appeal. In adopting MNA as the most feasible plan, the trial court considered and rejected other forms of remediation, the need for a contingency plan or institutional controls, and any costs associated therewith. Accordingly, any such evidence was then irrelevant to the trial court’s later determination of the costs of *393 implementing MNA.[40] A determination of whether evidence is relevant, as well as the decision to admit or exclude expert testimony, are within the broad discretion of the trial court, and its ruling will not be disturbed on appeal in the absence of a clear abuse of that discretion.[41]
We find no such abuse in this case. The Robichaux plaintiffs had a full and fair opportunity to present evidence regarding the feasibility and scope of the proposed MNA remedy, the feasibility and scope of their proposed pump and treat remedy, lanwhether pump and treat should be adopted and funded as a contingency plan, as well as the need for and costs associated with institutional controls. Plaintiffs in fact presented extensive evidence, including expert testimony and documentary evidence, at the merits trial. The trial court did not abuse its discretion in finding there was no need to re-litigate those issues at the post-trial deposit hearing. The Robichaux plaintiffs’ assignments of error and arguments presented on these issues have no merit.

c. Amount of cost deposit

The trial court adopted MNA as the most feasible plan. Following the post-trial deposit hearing, the final judgment orders Dow to pay directly the cost of implementing MNA and to procure a performance bond for the entire $3.2 million estimated cost of the remedy. As noted by the Robichaux plaintiffs in brief, this amount “reflects the actual uncontested cost of the court approved plan;” the cost estimate was computed by plaintiffs’ expert, Brent Bray, and Dow’s remediation expert, George H. Cramer, agreed with Mr. Bray’s calculation.
On appeal, however, the Robichaux plaintiffs challenge that amount as being insufficient to fund MNA. At the deposit hearing, Mr. Bray testified that he computed the base cost estimate of about $3.1 million, but then added the cost of several items that he opined were essential to the plan’s success, as well as some additional compliance-related items. Mr. Bray testified at trial that the result was an estimated MNA cost of between $7.8 and $8.1 million. Further, Mr. Bray suggested that a delineation of the groundwater contamination at Lighthouse Road be performed. Mr. Cramer disagreed with Mr. Bray on that issue and opined that delineation of the plume at Lighthouse Road is unnecessary because it lies within the class area and will be addressed by MNA.
The deposit hearing lasted five days. The trial court heard the testimony of several witnesses and considered documentary evidence as well. The trial court plainly rejected the Robichaux plaintiffs’ evidence regarding the necessity of incorporating additional costs over and above Mr. Bray’s initial cost estimate at the outset. The court likewise must have accepted Mr. Cramer’s views and rejected plaintiffs’ proposal to |S1 delineate the Lighthouse Road contamination. Where there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous.[42] Indeed, where the *394 factfinder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony.[43]
In this case, the evidence presented to the trial court supports the court’s acceptance of the uncontroverted initial cost estimate of $3.2 million. We find no manifest error in that decision. Additionally, as provided in the statute, the amount of the initial deposit is merely an estimate.[44] The Groundwater Act provides the trial court with continuing jurisdiction to require future deposits to cover additional costs when and if needed.[45] The Robichaux plaintiffs’ assignments of error concerning this issue are meritless.

B. Punitive Damages

In multiple assignments of error, many of which are again redundant, the Robi-chaux plaintiffs insist they have a claim for punitive damages. Plaintiffs admit there can be no claim for punitive damages under former Civil Code Article 2315.3[46] in the absence of compensatory tort damages. They argue, however, the trial court’s award of the cost of remediation under the Groundwater Act constitutes an award of compensatory damages. Plaintiffs note the threshold requirement for application of the Groundwater Act is a “claim for private law damages”—the Act merely restricts the manner in which the private law remediation damages are spent.
UaDow counters that the supreme court’s reinstatement of the trial court’s ruling denying the Robichaux plaintiffs’ motion to reinstate them claim for punitive damages constitutes the “law of the case,” which precludes relitigation of the issue in this appeal. Even absent application of that doctrine, Dow argues, the remediation subclass recovered no compensatory damages upon which a claim for punitive damages could attach. Finally, in a footnote, Dow contends all claims for punitive damages were resolved in the settlement agreement with the Thomas subclass.
We note initially that the issue of plaintiffs’ entitlement to punitive damages has previously been before this court three times. We thus find it necessary to begin our consideration of this issue with a look at the procedural history of the Robichaux plaintiffs’ claims for punitive damages.
In the Thomas plaintiffs’ original master class action petition, they asserted claims for both personal injuries and property damages. Dow was one of the named defendants and was alleged to be both negligent and strictly liable for plaintiffs’ damages. Plaintiffs initially prayed for compensatory damages only. Subsequently, the Thomas plaintiffs added a claim that Dow was responsible for punitive damages under former La. Civ. Code Art. 2315.3 based on its storage, handling, and disposal of hazardous and toxic substances,
*395 In their later-filed class action petition for damages, the Robichaux plaintiffs alleged that the contamination of the groundwater underlying their properties and the damage to said properties “was caused by the negligence, strict liability, and wanton and reckless misconduct” of Dow. In addition to property damages, plaintiffs claimed entitlement to punitive damages. Plaintiffs prayed that the class “be awarded compensatory and punitive damages.”
The Thomas and Robichaux cases were ultimately consolidated in March 2010. A new class definition was certified and specified to include two subclasses. Thereafter, in October 2010, prior to the trial of this matter, Dow filed a motion for partial summary judgment seeking dismissal of both the Thomas and Robichaux plaintiffs’ punitive damages claims. Dow asserted the Robichaux plaintiffs are not entitled to claim | ^punitive damages when their compensatory damage claim is limited to a claim for the remediation of usable groundwater under the Groundwater Act, Following a hearing, by judgment dated December 16, 2010, the trial court granted the motion, striking the Robichaux plaintiffs’ punitive damages claims with prejudice.
The Robichaux plaintiffs applied for writs with this court, seeking a reversal of the trial court’s judgment. On review, we granted writs and reversed the trial court, stating:
The judgment of the trial court granting Dow Chemical Company’s [sic] and Ivy Dupree’s motion for partial summary judgment and dismissing the Robicahux [sic] plaintiffs’ claim for punitive damages is reversed. La. Code Civ. P. Art. 2315.3 (now repealed) contemplated endangerment of the “public” as a prerequisite to the recovery of punitive damages. The statute itself contemplated that a private party be allowed to recover for public endangerment. Thus, we find that the trial court erred in granting the motion for partial summary judgment. The finding by the trial court that Article 2315.3 recovery cannot be premised on usable or unusable groundwater remediation claims is in error.
The supreme court denied writs, finding defendants have an adequate remedy on appeal.[47]
As stated earlier, on remand, the parties agreed to bifurcate the punitive damages claims for possible later trial. The Thomas subclass then settled their claims and the Robichaux subclass proceeded to trial in early 2011, on their groundwater remediation claims. In July 2011, after trial and following the court’s June 20, 2011 initial judgment, Dow again filed a motion for partial summary judgment seeking to dismiss the Robichaux plaintiffs’ claims for punitive damages. The matter was heard on August 15, 2011; by judgment dated October 11, 2011, the trial court granted Dow’s motion. The court noted that, considering all of the trial evidence, it previously found that the Robichaux plaintiffs abandoned any tort claim or any individual damages claim. Further,' counsel for the plaintiffs clearly indicated on the record and in the presentation of evidence at trial that the only claim of the Robichaux class was one for remediation of the aquifer. The trial court continued:
liiJn fact, the Robichaux class representatives testified that they were only seeking remediation. Of note, Plaintiffs’ case was originally postured pursuant to *396 the Groundwater Act and contained claims for both public and private law damages; however, the Plaintiffs relinquished the private ones. To reiterate, the Robichaux class requested redress only for remediation.
The trial court went on to point out that the prior January 5, 2011 ruling of this court reinstating the plaintiffs’ right to pursue punitive damages was made prior to trial and rendition of the trial court’s initial June 20, 2011 judgment. Specifically, the trial court then held:
This Court is of the opinion that no claims for exemplary damages exist for the Robichaux class. Notably, former Louisiana Civil Code Article 2315.3 read in part, ‘In addition to general and special damages, exemplary damages may be awarded [...].’ Here, there have been no compensatory damages, either general or special ‘awarded’ that would trigger a claim for exemplary damages. Accordingly, this Court finds there being no general or special damages proven at trial that this now repealed statute should not be used as a vehicle to drive a claim for exemplary damages herein.
The trial court again granted Dow’s motion for partial summary judgment dismissing the plaintiffs’ claims for punitive damages. A writ application followed and on December 7, 2011, this court declined to exercise its supervisory jurisdiction, finding the Robichaux plaintiffs have an adequate remedy by review on appeal.[48]
On January 24, 2012, the Robichaux plaintiffs sought to have their claims for punitive damages reinstated. The basis of their motion stemmed from comments made by counsel for Dow at a January 12, 2012 hearing to exclude testimony of certain experts offered by plaintiffs. Specifically, counsel stated, “Your Honor, as a matter of just general law, damages, whatever they are for, can never be awarded or based on speculation, hypotheticals, conjecture, it is just a matter of basic tort law.” The Robichaux plaintiffs argued that statement was “an unequivocal admission on the part of Dow that plaintiffs’ claims sound in tort and the deposit into the registry of the court is a deposit of tort damages for remediation.” They asserted that Dow’s argument constitutes “a judicial confession that plaintiffs’ remediation damages are tort damages.”
| ^Following a hearing on April 2, 2012, the trial court denied the motion to reinstate exemplary damages. A judgment was signed accordingly on April 3, 2012, On April 27, 2012, this court granted plaintiffs’ writ application, reversing the April 3 judgment.[49] We stated, in pertinent part:
The purpose of the remediation award is to protect the health, safety, and welfare of the public. The liability of Dow Chemical Company is based on improper conduct affecting the safety of the public, i.e. a tort. As a panel of this Court previously stated, La. Civil Code Article 2315.3 (now repealed) contemplated that a private party be allowed to recover for public endangerment. Accordingly, we find that the plaintiffs are allowed to pursue claims for exemplary damages arising from the contamination of the groundwater.
The supreme court subsequently granted Dow’s writ application. In a decision dated October 12, 2012, the court stated, “The judgment of the court of appeal is reversed, and the judgment of the district court is reinstated. See Adams v. J.E. Merit Construction, Inc., 97-2005 (La. *397 5/19/98), 712 So.2d 88”[50] We note that, in Adams, the supreme court found an employee was not entitled to recover punitive damages from his employer under article-2315.3 because the exclusivity provision in the workers’ compensation law prohibits an employee from recovering in tort. The court made it clear that damages under article 2315.3 are only recoverable on a derivative basis where a plaintiff is entitled to recover tort damages.
Here, we construe the supreme court’s reference to Adams as meaning that punitive damages under article 2315.3 are not derivative of the type of property damages involved here, regardless of whether those damages are based on negligence or property law principles or both. In other words, recovery of punitive damages under article 2315.3 cannot be premised on a groundwater remediation claim. It is not necessary to make that determination, however, for the following reasons.
As argued by Dow, because this court and the supreme court have previously addressed the issue of punitive damages in this case, we must consider whether the doctrine of the “law of the case” precludes us from reconsidering the issue. This | ^doctrine applies to all prior rulings or decisions of an appellate court or the supreme court in the same case, not merely those arising from the full appeal process. The doctrine applies to parties who were parties to the case when the former rulings were rendered and who thus had their day in court. The law of the case doctrine avoids relitigation of the same issue, promotes consistency of results, and encourages efficiency and fairness to the parties by affording a single opportunity for the argument and decision of the matter at issue.[51]
We find that the past action of the supreme court, reinstating the trial court’s judgment denying plaintiffs’ motion to reinstate exemplary damages, precludes re-litigation of this issue. The parties to the prior motion, writ applications, and this appeal are the same. The arguments and issues raised here are the same as those previously raised. Thus, we conclude that re-argument of this previously-decided issue is barred.
The Robichaux plaintiffs’ assignments of error on this issue have no merit.

C. Attorney Fees/Costs

Dow presents two arguments in one assignment of error urging that the trial court erroneously awarded attorney fees under the Groundwater Act. The Robi-chaux plaintiffs assign three errors challenging various aspects of the trial court’s determinations concerning attorney fees, costs, and prejudgment interest. Finally, appellant William W. Goodell, Jr. asserts five assignments of error contesting the trial court’s rulings on his claim for attorney fees and costs. We will address the arguments of each appellant in turn.

1. Dow Chemical

a. Ex post facto violation

Dow contends the attorney fees award should be vacated because it violates the ex post facto clauses of the United States and Louisiana Constitutions,[52] which prohibit 137retroactive application of penal legislation. The Robichaux plaintiffs claimed that Dow’s waste disposal—from the 1950s *398 through the 1970s—resulted in contamination of the Plaquemine aquifer. The Groundwater Act was enacted in 2.003 and allows for an award of costs, including attorney fees, to the prevailing party or parties in a remediation action,[53] Dow asserts that because an award of attorney fees is penal in nature,[54] the prohibition against ex post facto laws applies directly to the instant award, as it punishes Dow for conduct that allegedly occurred long before passage of the Groundwater Act.
The Robichaux plaintiffs counter that the Groundwater Act’s attorney fees provision has nothing whatsoever to do with deterrence or punishment. Rather, they argue, the Act “was designed to encourage private litigation against contaminators,”[55] They note Dow relies heavily on workers’ compensation jurisprudence, as well as cases involving statutes imposing criminal punishment or civil penalties attendant thereto. The plaintiffs assert that, unlike the present case, the cases Dow relies on involve attorney fees provisions with a clear punitive or deterrent purpose.
Dow responds to plaintiffs’ arguments by noting that many environmental statutes contain citizen-suit provisions. Fee-shifting provisions in those statutes thus encourage citizens to take on such suits by shifting the financial burden of the litigation to the losing party. The Groundwater Act, by contrast, does not contain a citizen-suit provision; thus, Dow argues, the shifting of fees to the responsible party is a tool to penalize and deter. Dow asserts the attorney fees provision in the Groundwater Act is | .^unconstitutional as applied to Dow because it punishes Dow for alleged conduct that occurred before the statute was enacted.
Louisiana Civil Code Article 6 provides, “In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary.” In La. R.S. 1:2, the Louisiana legislature has also indicated that “[n]o Section of the Revised Statutes is retroactive unless it is expressly so stated.” The Louisiana Supreme Court has interpreted the retroactivity provisions of La. C.C. Art. 6 and La. R.S. 1:2 to require a twofold inquiry. First, the court ascertains whether the legislature expressed its intent regarding retrospective or prospective application. If the legislature did so, the inquiry is at an end. If the legislature did not, the court must classify the enactment as substantive, procedural, or interpretive. Notwithstanding this analysis, even where the legislature has expressed its intent to give a law retroactive effect, that law must stay within constitutional confines.[56]
*399 The Groundwater Act was enacted by 2003 La. Acts 1166. Section 2 of Act 1166 provides, in pertinent part, “It is the express intent of the legislature that this Act shall be interpretative, remedial, and procedural and shall be applied both prospectively and retroactively only to cases initially filed after August 1, 1993 .... ” In light of this clear expression of legislative intent, the first step of our inquiry is dis-positive and no further inquiry on the issue of retroactive application is necessary. We must now address the constitutional issue that Dow argues such retroactive application presents.
Dow asserts the award of attorney fees under the Groundwater Act violates the ex post facto clauses of the United States and Louisiana Constitutions. Article I, §§ 9 and 10, of the United States Constitution[57] and Article I, § 23, of the Louisiana Constitution prohibit retroactive application of penal legislation.[58] The focus of the ex \mPost facto inquiry is whether a new law redefines criminal conduct or increases the penalty by which the crime is punishable.[59] Laws affecting only civil rights or regulating civil remedies are not within the rule that prohibits the passage of ex post facto laws.[60]
It has long been this state’s tradition for Louisiana courts to look to federal ease law for guidance in instances where our laws are patterned after or based upon federal law. In this case, not only is our constitutional prohibition against the enactment of ex post facto laws patterned after the United States Constitution, our enactment is mandated by Article I, § 10 thereof.[61] Federal jurisprudence involving an ex post facto challenge focuses on whether a legislative change alters the definition of criminal conduct or increases the penalty.[62]
Although the language of the United States Constitution does not define the term ex post facto, the case of Calder v. Bull[63] interpreted that term, and its holding has been applied ever since.[64] The Calder court outlined four categories of ex post facto laws: 1) a law making criminal, and subject to punishment, an activity that was innocent when originally done; 2) a law aggravating a crime or making it a greater crime than it was when originally committed; 3) a law aggravating a crime’s punishment; and 4) a law altering the rules of evidence to require less or different testimony than was required at the time of the commission of the crime so as to make easier the conviction of the offender.[65]
In determining whether application of a statute constitutes retroactive punishment forbidden by the ex post facto *400 clauses, the first inquiry is to ascertain 1 ^whether the legislature meant the statute to establish civil proceedings.[66] If the intention of the legislature was to impose punishment, that ends the inquiry. If however, the intention was to enact a regulatory scheme that is civil and nonpunitive, whether the statutory scheme is so punitive either in purpose or effect as to negate the state’s intention to deem it civil must then be examined. Because deference must be given to the legislature’s stated intent, only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.[67] In analyzing the effects of a particular statute, the most relevant factors to consider are whether, “in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.”[68]
The United States Supreme Court has held that the prohibition of ex post facto laws does not extend to every change of law that may work to the disadvantage of a defendant.[69] Similarly, our supreme court has observed that “whether a sanction constitutes punishment is not determined from the defendant’s perspective.”[70]
In resolving whether the provision ranks as penal for ex post facto purposes, we must first ask whether .the legislature intended the Groundwater Act to establish civil proceedings. We find there is no question that the legislature so intended. La. R.S. 30:2015.1 contains explicit language indicating that it pertains to “any civil action” for the evaluation and remediation of contamination or pollution that impacts or threatens to impact usable groundwater. Nevertheless, however, we must next examine whether the statutory scheme is so punitive either in purpose or effect as to negate the legislature’s intention to deem it civil.
141We turn now to the factors set forth in Smith v. Doe as an aid in analyzing the effects of the provision in question. While an award of attorney fees has historically been regarded as a punishment in certain cases, such as in workers’ compensation matters,[71] such is not the case here. We agree with the Robichaux plaintiffs that the Groundwater Act’s attorney fees provision simply does not involve deterrence or punishment. Further, the award clearly imposes no “affirmative disability or restraint,” nor does it “promote the traditional aims of punishment.”[72]
In Smith v. Doe, the Supreme Court noted that the fourth factor, the statute’s rational connection to a nonpuni-tive purpose, is a “[m]ost significant” fac *401 tor in a determination that the statute’s effects are not punitive.[73] A careful review of the subjective intent enunciated in La. R.S. 30:2015.1 shows that the legislature enacted the Groundwater Act with a non-punitive purpose. Section A clearly indicates that the statute was enacted to protect, conserve, and replenish the natural resources of the state, including water, consistent with the health, safety, and welfare of the people pursuant to the mandates of the Louisiana Constitution. The Act provides a set of civil procedures to be followed in litigation wherein the plaintiffs seek “to recover damages for the evaluation and remediation of any contamination or pollution that is alleged to impact or threaten usable ground water ....”[74] We believe the Groundwater Act merely adopts procedures to ensure that environmentally damaged property is actually remediated. La. R.S. 30:2015.1 was designed to encourage private litigation against contaminators while ensuring state administrative oversight of the remediation efforts borne of the private litigation.[75] The provisions of this statute are intended to protect the rights of the public in the natural resources of the state. Further, we feel the |42Groundwater Act’s inclusion of attorney fees as part of costs awarded to the prevailing party was intended to benefit private litigants who can no longer pay contractual attorney fees out of any remediation damages recovered, as the Act requires all such damages be paid into the registry of the court and actually used for the purpose of remediation. We believe the provision in question has a rational connection to its nonpunitive purpose and is not excessive with respect to that purpose.
A law serving nonpunitive goals “is not punishment even though it may bear harshly upon one affected” and here, we find it clear that La. R.S. 30:2015.1 has a purpose other than punishing groundwater contaminators.[76] We find the Groundwater Act’s attorney fees provision is predominantly nonpunitive in both purpose and effect and, therefore, conclude its retroactive application to Dow does not offend the constitutional prohibition against ex post facto legislation. Dow’s arguments to the contrary are not persuasive.

b. Lodestar method and reasonableness of award

Alternatively, Dow argues the trial court erred when it awarded attorney fees without calculating a reasonable fee according to the lodestar method. Dow contends that, under the lodestar approach, the Robichaux plaintiffs bore an evidentiary burden to establish the number of hours reasonably expended on the litigation and a reasonable hourly rate. Further, under the Groundwater Act, plaintiffs had the additional burden of proving the number of hours spent “producing that portion of evidence that directly relates to the claims of contamination or pollution that impacts or threatens to impact usable ground water.”[77] Here, Dow asserts, the trial court failed to hold plaintiffs to their burden. They offered no evidence of a reasonable hourly rate and, further, their reconstructed time records *402 were merely estimates of the total time their attorneys expended on the case. In other words, plaintiffs presented no evidence of actual time spent that directly related to their contamination claims.
hsDow also claims the $6.3 million attorney fees award is excessive on its face and is unreasonably high under the Rivet factors. Specifically, Dow claims the award is exorbitant in light of the ultimate result obtained—the remediation remedy that the agencies had selected years ago and that Dow had already begun to implement. Further, Dow contends the $6.3 million award is arbitrarily high as it is almost twice the value of the remediation remedy of $3.2 million. Dow notes that plaintiffs expert witness, Robert Klonoff, agreed that if $3 million was deposited into the court registry, a fee award of forty percent of that amount, or $1.2 million, would be reasonable. Dow contends an award of four times that amount constitutes an abuse of the trial court’s discretion and should be dramatically reduced.
The Robichaux plaintiffs counter that the attorney fees award was reasonable, noting the trial court employed the Rivet[78] criteria in determining the award. Plaintiffs stress that the lodestar methodology is not the only acceptable means of calculating fees. They assert the trial court’s decision to apply Rivet rather than a lodestar analysis was entirely within its discretion. Where, as here, the fee award is based on a factor-by-factor Rivet analysis, there is no requirement that prevailing rate evidence be admitted. Plaintiffs note there is affidavit evidence of the time expended by class counsel, which totals 11,-865 hours.
In response, Dow notes the Robichaux plaintiffs offered no evidence of what portion of the total time expended on the litigation was spent producing evidence that directly relates to the contamination claims. Thus, it asserts, the trial court did not comply with the Groundwater Act’s explicit limitation on the fees that are recoverable.
We agree with the Robichaux plaintiffs that the lodestar methodology[79] is not the only acceptable means of calculating attorney fees. It is well settled that courts may inquire into the reasonableness of attorney fees as part of their inherent authority to regulate the practice of law, “[r]egardless of the language of the statutory authorization | ,Mfor an award of attorney fees or the method employed by the trial court in making an award of attorney fees... ,”[80] The factors to be taken into consideration in determining the reasonableness of attorney fees include; 1) the ultimate result obtained; 2) the responsibility incurred; 3) the importance of the litigation; 4) the amount of money involved; 5) the extent and character of the work performed, 6) the legal knowledge, attainment, and skill of the attorneys; 7) the number of appearances involved; 8) the intricacies of the facts involved; 9) the diligence and skill of counsel; and 10) the court’s own knowledge. These factors are derived from Rule 1.5(a) of the Rules of Professional Conduct, which require that a *403 lawyer’s fees be reasonable.[81] Finally, the trial court has much discretion in fixing an award of attorney fees and its award will not be disturbed on appeal absent a showing of an abuse of discretion.[82]
Here, the trial court issued written reasons for its judgment on attorney fees and costs. As the plaintiffs’ attorneys did not provide the trial court with hourly rates or time expended, rather than employing the lodestar method, the court instead applied the Rivet factors to the case at hand. The court specifically “found several of the factors particularly helpful” in determining the amount of attorney fees to be awarded; the extent and character of the work performed, the number of appearances involved, and the court’s own knowledge. The trial court, in its discretion, assigned a value, as warranted, to each of the Rivet factors. Those values included: 1) the ultimate result obtained, $500,000.00; 2) the responsibility incurred, $500,000.00; 3) the importance of the litigation, $2,000,000.00; 4) the amount of money involved, $0.00; 5) the extent and character of the work performed, $500,000.00; 6) the legal knowledge, attainment, and skill of the attorneys, $1,000,000.00; 7) the number of appearances involved, $1,000,000.00; 8) the intricacies of the facts involved, $400,000.00; 9) the skill and diligence of counsel, $400,000.00; and 10) the court’s own knowledge, $0.00. In total, the trial court awarded attorney fees in the amount of $6,300,000.00. The trial court |45noted it also evaluated the reasonableness of the award as a whole. It utilized the briefs and exhibits provided by both sides, the testimony of the witnesses, and all evidence presented.
Considering the factors for reasonableness as applied to this case, we are impressed with the time and effort of the attorneys pursuing remediation in the face of unyielding resistance on the part of Dow. This litigation has now spanned more than a decade; the record is astronomical. The case is difficult in that it involves a res nova application of the Groundwater Act and requires consideration of specialized scientific and geologic principles pertaining to groundwater contamination. The result obtained was vital to furthering the Act’s objective in that the trial court is now vested with continuing jurisdiction to ensure that remediation is completed. Based on the aforementioned Rivet factors and their application to the particular facts of this case, as well as the evidence presented at the hearing on this issue, we cannot say the trial court’s award represents a clear abuse of its discretion. Therefore, the award will not be disturbed. Dow’s arguments on this issue lack merit.

2. Robichaux plaintiffs

a. Litigation costs award

The Robichaux plaintiffs, as appellants, challenge the trial court’s award of litigation costs. They note the court denied fully two-thirds of the sums listed in their costs documentation “without offering any reason for its ruling.” Plaintiffs thus assert the trial court erred as its award does not comply with the Groundwater Act’s mandate to award “all costs.”[83] They claim the evidence shows they expended $1,701,254.72 in pursuit of this action and the judgment should be increased to award this amount. In addition to reimbursement for their own direct costs, the Robichaux plaintiffs sought an award for *404 cost items paid for by counsel for the Thomas subclass that were used at the Robichaux trial.
14(jDow counters first that the trial court did not err in refusing to award plaintiffs costs expended by counsel for the Thomas subclass. The Thomas subclass settled and released its claims against Dow. In its appellee brief, Dow suggests, “Knowing that they cannot lawfully obtain additional sums from Dow directly, they have—apparently—induced Remediation subclass counsel to attempt to procure those sums ‘through the back door’ on their behalf in this appeal.” Dow notes that both sets of attorneys signed the original brief seeking an increase in the costs award.[84] Second, Dow asserts the trial court did not err in refusing to award costs that were not attributable to producing evidence directly related to claims of groundwater contamination.
We agree with Dow on both points. The settlement agreement between Dow and the Thomas subclass plainly specifies that it includes all costs and attorney fees. The settlement is final; there was no appeal. We decline to disturb the trial court’s costs award to increase the amount of costs to which the Thomas subclass voluntarily agreed.
Further, the trial court’s written reasons for its award of costs indicate that the court fully considered the mandate of the Groundwater Act when ruling on each item of costs submitted by the Robichaux plaintiffs. First, the court considered the ten objections raised by Dow. The trial court noted it ruled individually on each cost item submitted. Each was evaluated based on the documentation provided, the validity of Dow’s objections, and the court’s own knowledge. The trial court sustained four of Dow’s objections and sustained another in part. After eliminating the costs associated with those objections and giving individual consideration to each item submitted, the tidal court awarded total costs in the amount of $699,153.78. After a thorough review, we conclude the trial court did not abuse its discretion. The Robi-chaux plaintiffs’ challenges to the trial court’s award of litigation costs have no merit.
147⅛. Prejudgment interest
The Robichaux plaintiffs next challenge the trial court’s award of judicial interest only from the date of judgment, rather than from the date of judicial demand. Plaintiffs note that La. C.C.P. Art. 1921 states, “The court shall award interest in the judgment as prayed for or as provided by law.” Plaintiffs assert they prayed for prejudgment interest in their original petition. Further, they claim prejudgment interest attaches automatically under La. R.S. 13:4203[85] because this is a tort case. They assert prejudgment interest should have been applied to the award of attorney fees and costs as well, claiming they had “substantive vested rights to legal interest from the date of judicial demand” on these awards.
In response, Dow notes that plaintiffs were not awarded compensatory damages. Without a damage award, Dow asserts plaintiffs are not entitled to prejudgment interest. Dow claims its position is supported by the Groundwater Act’s require *405 ment that interest be deposited into the registry of the court and any amount left over following remediation must be returned to Dow. Finally, Dow contends the trial court’s decision to award interest from the date of judgment, not from the date of judicial demand, is consistent with Louisiana law.
In this case, contrary to the Robichaux plaintiffs’ assertion, the trial court’s final judgment does not award any interest on the $3.2 million award to implement the remediation plan. The court awarded interest on all attorney fees and costs awards from the date of judgment. The trial court denied all claims for prejudgment interest. The Robichaux plaintiffs claim entitlement to prejudgment interest on both the remediation plan award and the attorney fees and costs awards. We find they are entitled to neither.
Our jurisprudence provides that “[p]rejudgment interest, which stems from the damages suffered by the victorious party, is meant to fully compensate the injured party for the use of funds to which he is entitled but does not enjoy because the Lsdefendant has maintained control over the funds during the pendency of the action.”[86] An award of prejudgment interest “may be necessary to make plaintiff whole.”[87] In contrast, postjudgment interest is a prospective award the purpose of which is to encourage prompt payment of amounts awarded in the judgment, and to compensate the victorious party for the other party’s use of funds to which the victor was entitled under the judgment.[88] Interest has been described as “compensation allowed by law or fixed by the parties for the use or detention of money, or allowed by law as additional damages for loss of use of the money due as damages; during the lapse of time since the accrual of the claim.”[89] It is recognized that money has a “use” value, and that prejudgment interest, which represents the use that the defendant has had of the money found to be owed to the plaintiff, is a necessary component of the plaintiffs full compensation. “Although the award for delay of time may be ‘in the nature of interest,’ in reality, it is merely an extension of the compensatory damages necessary to make a plaintiff whole.”[90]
We find that these principles are not applicable under the scheme established by the Groundwater Act. The Act states that “all damages or payments in any civil action, including interest thereon, awarded for the evaluation and remediation of contamination or pollution that impacts or threatens to impact usable ground water shall be paid exclusively into the registry of the court ....”[91] The trial court must issue any necessary orders “to ensure that any such amount is actually expended for the evaluation and remediation of the contamination of the usable ground water for which the award or | ^payment is made.”[92] The Act further provides that the trial court “shall retain jurisdiction over the *406 funds deposited and the party cast in judgment until such time as the evaluation and remediation is completed.”[93] Finally, the Act allows the trial court to order the party cast in judgment to deposit additional funds if the amount of the initial deposit is insufficient to complete the remediation and, upon completion, must order any funds remaining in the registry to be returned to the depositor.[94]
This court finds that, under the Groundwater Act, the Robichaux plaintiffs are not entitled to any interest, either prejudgment or postjudgment, on the amount awarded for remediation. First, pursuant to the Act, Dow must fund remediation through its completion; it is irrelevant if the fund is comprised of remediation damages plus interest, or not. If more money is needed than what was deposited initially, Dow must deposit additional funds. Upon completion of remediation, any remaining funds will be returned to Dow. Further, as noted, interest has been considered a mere extension of the compensatory damages necessary to make a plaintiff whole. It follows then that the Robichaux plaintiffs are not entitled to an award of interest because they are not receiving compensatory damages. The notion that interest is intended to fully compensate the victorious, injured party does not fit within the framework of the Groundwater Act, the purpose of which is not to compensate anyone, but instead to ensure that contaminated groundwater is actually remediated.
Likewise, we find that the Robi-chaux plaintiffs are not entitled to prejudgment interest on the awards of attorney fees and costs. Attorney fees are not ascertainable until awarded by the court and interest thereon runs from the date of the award.[95] The same is true for expert witness fees and costs.[96] Accordingly, the trial court correctly 1 Bnawarded interest on the attorney fees and other costs from the date of the judgment awarding the same.
The Robichaux plaintiffs’ assignment of error on this issue lacks merit.
c. Discovery
The Robichaux plaintiffs did not assign as error the quantum of attorney fees awarded. In the event Dow challenges the fee award, however, plaintiffs assert the trial court erred in denying their request to obtain discovery of Dow’s attorney fees and costs. Plaintiffs cite several federal court decisions holding it is proper to allow the prevailing plaintiff to discover the losing defendant’s billing records where the defendant challenges the plaintiffs fee application; plaintiffs cite no Louisiana authority, however, in support of their argument. In any event, we find it unnecessary to consider this issue as we have found no merit in Dow’s challenges to plaintiffs’ attorney fees award.

3. William W. Goodell, Jr.

To the extent necessary to understand and resolve the issues presented by Mr. Goodell’s assignments of error, following is a summary of the factual and procedural history as pertains to his involvement in this matter. Mr. Goodell is an attorney specializing in environmental law. The record indicates that in Fall 2001, Mr. Goodell became involved in a case concerning persons who were exposed to the contaminat *407 ed well water at the Myrtle Grove Trailer Park. At that time, he retained as expert witnesses Dr. Jeff Hanor and Dr. Paul Templet to help prove that Dow was the source of the contamination. Thereafter, on January 4, 2002, Mr. Goodell filed in federal court a mass joinder personal injury action, Anderson v. Dow Chemical Co. Mr. Goodell worked on the Anderson case until it was dismissed on summary judgment in 2006. That ruling was affirmed on appeal.[97]
While not enrolled as counsel of record in the Robichaux suit when it was first filed in 2002, Mr. Goodell claims he participated informally in the case from its outset, providing assistance and information to counsel of record. He was invited to formally 1st join in this action in April or May 2004. Mr. Goodell was responsible for “developing the geologic and geochemical science” to prove that Dow was the source of contamination of the Plaquemine aquifer.
By judgment dated October 18, 2005, then-presiding Judge James Best certified the Robichaux class within geographical boundaries established by vinyl chloride plume maps prepared by Mr. Goodell, experts Dr. Jeff Hanor and Dr. Paul Tem-plet, and a draftsman. The same judgment appointed Victor Marcello, Donald Car-mouche, John Carmouehe, Lewis Ungles-by, Robert Marionneaux, Jr., and William Goodell, Jr. as class counsel.
Following class certification, Mr. Goo-dell’s primary involvement in the Robi-chaux case was completed; he allegedly continued, however, to oversee certain matters and lend his assistance as a consultant on technical environmental science matters and general case theory development to the other Robichaux class counsel. Further, Mr. Goodell gave co-counsel the organized and indexed documents he had amassed in preparation for the class certification hearing.
On March 30, 2010, the supreme court appointed Judge Jerome Winsberg to preside ad hoc over the Robichaux case. Mr. Goodell did not participate in the trial that was held before Judge Winsberg in early 2011; he claims, however, that evidence of groundwater contamination that he developed was produced at trial. Following the trial, after finding Dow liable for groundwater contamination of the class area, the trial court took up the matter of attorney fees and costs. Mr. Goodell, among others, submitted an application for a class attorney fees award and associated expense reimbursement. An eight-day hearing on the issue was held before Judge Winsberg between April and October 2012. Mr. Goo-dell’s direct testimony regarding his contribution as class counsel was presented by affidavit, which included his detailed billing records.
Thereafter, in the May 22, 2013 final judgment, the trial court awarded Mr. Goodell fees of $43,820.00, ten percent of his documented time allegedly dedicated to proving groundwater contamination, and costs of $13,437.89, again ten percent of his | ¡¡¡.documented expenses. In the same judgment, the court made a separate award to co-class counsel, the Talbot, Carmouehe & Marcello and Unglesby & Marionneaux law firms, of $6.3 million in fees and $699,153.78 in costs. Mr. Goodell seeks review of the trial court’s judgment awarding separate attorney fees and costs to him under La. R.S. 30:2015.1(F).

a. Stipulation

In his first assignment of error, Mr. Goodell claims that at the hearing on attorney fees, the parties stipulated on the record that the trial court would enter a single unitary class counsel fee award and *408 that the court would only consider apportionment of fees to individual attorneys if class counsel could not agree to a distribution. He asserts the trial court erred in disregarding the joint stipulation in making a separate award to Mr. Goodell, to his immense prejudice.
Dow notes in brief that it was not a party to the purported stipulation. While the record is clear that Mr. Goodell offered a stipulation to other class counsel, Dow claims it is unclear whether class counsel accepted the stipulation. We agree.
The record indicates that, on the first day of the fee hearing, Robert Klonoff was called by plaintiffs to testify as an expert in attorney fees in class actions. Following direct examination and tender of the witness by Mr. Marcello, counsel for Mr. Goo-dell, Mr. Murray, offered a stipulation to other class counsel. The following colloquy took place:
MR. MURRAY:
I think I can eliminate the need to ask Professor Klonoff any questions by offering a stipulation to other class counsel.
The stipulation would be, Your Honor, that the Court make one unitary fee award to class counsel; and that class counsel, including Mr. Goodell, will then attempt to negotiate an allocation of that fee award, with the Court reserving jurisdiction to resolve a dispute if the allocation can’t be mutually agreed upon, and I fully expect that it will be.
THE COURT:
Class counsel as included in both classes?
MR. MURRAY:
No, just the Robichaux.
J^MR. MARCELLO:
Just the Robichaux class.
THE COURT:
Okay.
MR. MARCELLO:
Mr. Goodell was appointed class counsel along with my firm. He’s participated up to a point, and so he’s making a claim for his attorneys fees.
THE COURT:
I understand you’re intervening in the case.
MR. MURRAY:
No, we’re not intervening, Your Hon- or.
As class counsel, Mr. Goodell seeks a fee award for his efforts on behalf of the class. And we’ll present the evidence to that, and Your Honor can consider it. But rather than ask the Court to make separate awards in the Robichaux matter, we’ve agreed that the award that Your Honor makes, we will attempt to allocate amicably, among all class counsel, failing which we would have to come back to the Court.
THE COURT:
All right.
As there were no objections, that is all that was stated on the issue.
We find the record fails to clearly establish that the stipulation referenced by Mr. Goodell was indeed agreed to by other class counsel. The record contains a minute entry dated April 10, 2012, which states merely, “Attorney Steve Murphy standing in for William Goodell asked for fee award to Robichaux case only. Mr. Murphy had no questions of Mr. Kloneoff [sic].” The minute entry does not mention the stipulation in question. By contrast, the same minute entry indicates later that day, “The Parties then stipulated and agreed that Mr. Williams [sic] Goodell would testify.” Importantly, the transcript of that portion of the proceeding bears the heading, “STIPULATION.” Mr. Murray stated, “The parties stipulate and agree *409 that were William W. Goodell, Jr. called to the stand, he would testify as set forth in his affidavit and the exhibits attached thereto ...Mr. Viator, on behalf of Dow, stated, “We agree to the stipulation to the [ rvlextent they’re offering his affidavit and these exhibits as the direct testimony of Mr. Goodell. We’ll reserve our rights to conduct the appropriate discovery, raise the appropriate objections and potentially cross-examine Mr. Goodell.” Mr. Murray responded, “That’s acceptable, Your Hon- or,” and the court stated, “Very well. It’s admitted.” The affidavit and exhibits were admitted into evidence. Of note, the transcript of the portion of the proceeding involving the alleged attorney fees stipulation does not likewise bear the heading, “STIPULATION.” Rather, it just contains the above-quoted colloquy.
Without convincing evidence that the stipulation was agreed to by all class counsel, there certainly can be no finding that the trial court committed reversible error in making a separate award to Mr. Goo-dell. This assignment of error has no merit.

b. Application of lodestar methodology

Mr. Goodell next complains of the trial court’s application of a straight lodestar computation to his application for fees with no consideration of the Rivet[98] factors. In written reasons for judgment on attorney fees and costs, the trial court stated that, because Mr. Goodell provided the court with detailed billing and time logs, the court evaluated the work actually performed by Mr. Goodell, noting it employed the lodestar method. For co-class counsel, however, the trial court applied the Rivet factors because they did not provide the court with hourly rates or time expended. Thus, Mr. Goodell argues the trial court essentially penalized him for submitting detailed, contemporaneous time records. He asserts the trial court’s failure to consider the Rivet factors attributable to him, unlike the attorneys for whom the court did consider those factors, was a reversible error of law.
Dow, on the other hand, asserts the trial ■ court erred in using only the Rivet factors in considering the fee award to the Car-mouche and Unglesby firms. As it argued in response to the Robichaux plaintiffs’ assignments of error, Dow claims the lodestar method is the appropriate measure of fees because the Groundwater Act |fficontains a fee-shifting provision. It follows then that Dow believes the trial court correctly employed the lodestar method to determine the amount of fees to be awarded to Mr. Goodell. Dow notes there is no indication from the record that the trial court did not consider the Rivet factors and ultimately conclude that the lodestar fee approach was more appropriate as to Mr. Goodell.
In written reasons, the trial court specified that it based its award of fees to Mr. Goodell on the lodestar method, as he submitted detailed billing and time logs from which the court could evaluate the work actually performed by Mr. Goodell. The court found that an award of ten percent of the attorney fees and costs submitted was reasonably attributable to the persuasive evidence presented at trial.
The fee shifting provision in the Groundwater Act provides authority for the court to award reasonable attorney fees to a successful plaintiff in cases involving contamination of usable groundwater. As noted previously, a reviewing court may inquire into the reasonableness of attorney fees regardless of the method employed by the trial court in making an award.[99] In *410 other words, a trial court is free to employ whatever method it chooses in setting the amount of a reasonable award. For example, the initial estimate of a reasonable attorney fee can be calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate, otherwise known as the “lodestar method.” The amount of the fee must' simply be reasonable, and is determined on the facts of each case.[100]
We agree with Dow that there is no indication in the record that the trial court did not consider the Rivet factors and ultimately conclude that the lodestar fee approach was more appropriate as to Mr. Goodell; it was entirely within the trial court’s discretion to. do so. We conclude the trial court did not err as a matter of law in utilizing the acceptable lodestar method in determining a reasonable amount of the award of attorney fees to Mr. Goodell. We find this assignment of error meritless.
[ mc. Sufficiency of the award
In two assignments of error, Mr. Goodell challenges the sufficiency of his award. First, in assignment of error number three, Mr. Goodell asserts that the trial court’s determination that only ten percent of his time and expenses submitted was attributable to proving groundwater contamination was an abuse of discretion. He claims the uncontro-verted evidence established that the vast majority of his time was devoted to producing that portion of the evidence that directly relates to the claims of contamination. Mr. Goodell notes that trial courts are afforded broad discretion in setting fee awards because, having presided over the litigation, they are usually in the best position to assess the attorney’s contributions; here, however, Mr. Goodell’s time records reflect that all of the time he submitted was for work performed prior to Judge Winsberg’s ad hoc assignment on March 30, 2010. Accordingly, Mr. Goodell contends the trial court’s fee award should not be afforded the same deference as fee awards in most cases.
Next, in his fifth assignment of error, Mr. Goodell claims that the trial court’s award, which amounts to $40.00 per hour, is woefully insufficient. He asserts an attorney fees award should be high enough to facilitate plaintiffs’ access to the court to vindicate their rights by providing compensation sufficient to attract competent counsel.[101]
Dow argues in response that the record plainly supports the trial court’s evaluation of the work Mr. Goodell actually performed in this matter and its reduction of the award to ten percent of the fees and costs submitted. It notes that roughly eighty percent of the time submitted is attributable to work he performed in a prior case; the vast majority of the fees and costs submitted pre-dates Mr. Goo-dell’s involvement in the Robichaux matter. Further, Dow asserts that Mr. Goo-dell’s role was limited to developing the geologic and geochemical science to prove it is responsible for the contamination for purposes of class certification, not the ultimate trial.
ImAt the fee and expense hearing in the instant case, Mr. Goodell offered his affidavit and supporting exhibits as his direct testimony; he was, however, cross-examined by counsel for Dow. Mr. Goodell testified that he agreed to formally participate in the Robichaux action in April or May 2004, and he started actively working on a *411 detailed preparation for class certification. He stated, however, that a significant part of the actual discovery he performed with regard to contamination of the aquifer occurred prior to May 2004. Mr. Goodell had previously done a lot of work that he “just plugged into that class certification process.” At that time, Mr. Goodell had been in an active working process for three years representing his clients in the Anderson case.
The hearing on Robichaux class certification was in January 2005; Mr. Goodell was appointed class counsel by Judge Best in October 2005. Before his appointment, Mr. Goodell did not have a written contract for fees with either the individuals in the Robichaux class or the attorneys who may have had contracts with the plaintiffs. Mr. Goodell testified he believed his appointment as class counsel entitled him to a share of the attorney fees. Finally, Mr. Goodell admitted that after class certification, his class counsel assignment and work was basically done.
On review, the appellate court examines an award of attorney fees for an abuse of discretion. The trial court’s factual determinations will not be set aside absent manifest error.[102] Here, the trial court found as fact that only ten percent of the fees and expenses Mr. Goodell submitted were attributable to proving groundwater contamination. There was ample evidence that a large portion of Mr. Goodell’s time was dedicated to the Anderson case and to the issue of class certification in the Robi-chaux case. As such, we do not find the trial court’s factual findings in this regard were manifestly erroneous. After a thorough review, we further find no abuse of the trial court’s discretion in setting the amount of Mr. Goodell’s award, which we find to be reasonable in light of the unique factual situation presented. These assignments of error lack merit.

d. Anderson work product

|fiSMr. Goodell claims the trial court’s determination that only ten percent of his time submitted was dedicated to proving groundwater contamination would indicate that the court accepted Dow’s argument that Mr. Goodell could not be compensated for work product he developed in the Anderson action. To the extent that is the case, Mr. Goodell claims in his fourth assignment of error that finding constitutes reversible legal error. He argues his experience and work product from the Anderson case was essential to proving groundwater contamination in the trial of this case.
Dow counters by noting that the reason why Mr. Goodell has never been compensated for the time and expenses he incurred in Anderson is simple—he did not represent the prevailing party. It argues there is no basis in law or equity to require Dow to pay attorney fees associated with the prosecution of. a case that Dow successfully defended. As a result, Dow asserts, the trial court was justified in discounting any fees and expenses attributable to the Anderson matter.
We agree with Dow on this issue. Mr. Goodell cites no law in support of his assertion that the trial court committed reversible legal error. Of note, neither the final judgment nor the trial court’s written reasons indicate that the court refused to award any fees or expenses associated with Anderson. The trial court merely concluded that only ten percent of the amounts claimed were attributable to proving groundwater contamination in this case. For the reasons earlier expressed, we find no manifest error in that conclu *412 sion. This assignment of error has no merit.

D. Motion to Strike

On August 18, 2015, Dow moved this court to strike portions of the original brief of the Robichaux plaintiffs-appellants with respect to any request for relief by, or on behalf of, counsel for the Thomas subclass, who have no alleged procedural or substantive standing to seek any relief from this court. Because we have afforded no such relief, Dow’s motion to strike is denied as moot.
| mV. CONCLUSION
Finding no merit in any of the appellants’ assignments of error, the judgment of the trial court is hereby affirmed in its entirety. Costs of this appeal are assessed to The Dow Chemical Company.
AFFIRMED. MOTION TO STRIKE DENIED.
Crain, J., concurs.

. The standards set forth in the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j-26, are used as acceptable limits for the contaminant at issue: vinyl chloride has an MCL of 2 parts per billion (ppb).

. Active measures would require large-scale pumping wells and/or surface infrastructure. Construction would cause considerable disruption of commercial and residential activities.

. This suit was filed on April 3, 2001, in the 18th Judicial District Court, Parish of Iber-ville, and was assigned docket No. 55,127 in Division B before Judge Robin Free.

. This suit was filed in March 2002, in the 18lh Judicial District Court and assigned docket No. 56,803 in Division A before Judge James Best.

. In addition, the Robichaux, plaintiffs named 21 affiliated parties, known as the Messina defendants, who allegedly contributed to the contamination of the aquifer along with Dow. Only one of these defendants (Industrial Haulers) was ever served with this suit. That party was not cast in the judgment that forms the basis of these appeals.

. The Robichaux plaintiffs abandoned the claims for injunctive relief in their Fourth Amending Petition filed April 15, 2002.

. La. R.S. 30:2015.1 was enacted in 2003 as Louisiana's groundwater remediation statute ( the Groundwater Act).

. Both class certifications were affirmed on appeal. See Thomas v. A. Wilbert &Sons, L.L.C., No. 2008-0959, 2009 WL 1272358 (La. App. 1 Cir. 5/8/09), writ denied, 2009-1435 (La. 10/2/09), 18 So.3d 125; Robichaux v. State ex rel. Dept. of Health and Hospitals, 2006-0437 (La.App. 1 Cir. 12/28/06), 952 So.2d 27, writs denied, 2007-0567, 2007-0580, 2007-0583 (La. 6/22/2007), 959 So.2d 503, 504.

. See Thomas v. A. Wilbert & Sons, L.L.C., 2009 WL 1272358 at p. 3, n.8.

. Thomas v. A. Wilbert & Sons, L.L.C., No. 2010 CW 2308 (La. App. 1 Cir. 1/5/11), writ denied, 2011-0265 (La. 4/8/11), 61 So.3d 685.

. The subsequent post-trial procedural history of the punitive damages claims is set forth later in this opinion in our treatment of the issue as raised on appeal.

. In response to motions filed by Dow and William W. Goodell, Jr., the trial court issued written reasons for judgment on attorney fees and costs on August 30, 2013.

. Both the Robichaux plaintiffs and Dow moved for a new trial following the trial court’s final judgment of May 22, 2013. The trial court held a hearing on the motions on September 17, 2013; both motions were thereafter denied in separate judgments dated September 25, 2013.

. An order of appeal was signed on November 21, 2013.

. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La. 1979).

. Arceneaux v. Domingue, 365 So.2d at 1333; see also Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987).

. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La. 1990).

. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 883 (La. 1993); Sistler v. Liberty Mutual Ins. Co., 558 So.2d at 1112.

. La. R.S. 30:2015.1(1).

. As set forth in their petitions, plaintiffs’ claims are grounded upon these general propositions: "[ejvery act whatever of man that causes damage to another obliges him by whose fault it happened to repair it,” La. Civ. Code Art. 2315; "[ajlthough a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him,” La. Civ. Code Art. 667; and the owner of rights in a common source supply of minerals may not "make works, operate, or otherwise use his rights so as to deprive another intentionally or negligently of the liberty of enjoying his rights or that may cause damage to him,” La. R.S. 31:10.

.Yiannopoulos, Civil Responsibility in the Frame work of Vicinage: Articles 667-9 and 2315 of the Civil Code, 48 Tul.L.Rev. 195, 196 (1974).

. Id. at 197.

. Id. at 201, 205.

. Id. at 206-207.

. La. R.S, 31:4 specifies, "The provisions of this Code are applicable to all forms of minerals, including oil and gas, They are also applicable to rights to explore for or mine or remove from land the soil itself, gravel, shells, subterranean water, or other substances occurring naturally in or as a part of the soil or geological formations on or underlying the land.”

. La. R.S. 31:2 states that the Mineral Code’s provisions "are supplementary to those of the Louisiana Civil Code and are applicable specifically to the subject matter of mineral law.” In the event of conflict between the Mineral Code and those of the Civil Code or other laws, the provisions of the Mineral Code shall prevail. If the Mineral Code does not expressly or impliedly provide for a particular situation, the Civil Code or other laws are applicable,

. La. R.S. 31:6 provides, “Ownership of land does not include ownership of oil, gas, and other minerals occurring naturally in liquid or gaseous form, or of any elements or compounds in solution, emulsion, or association with such minerals. The landowner has the exclusive right to explore and develop his property for the production of such minerals and to reduce them to possession and ownership.”

. See Comment to La. R.S, 31:10.

. La. R.S. 31:8.

. La. R.S. 31:10.

. See Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A), 2001-2219 (La.App. 1 Cir. 11/20/02), 837 So.2d 11, 36-39, writs denied, 2003-0418 (La. 4/21/03), 841 So.2d 805, 2003-0438 (La. 5/16/03), 843 So.2d 1130.

. Liability may rest on any ground exclusively or on all cumulatively, A plaintiff may have multiple causes of action for a single recovery, one resting on precepts of the law of obligations and the others on precepts of the law of property. Yiannopoulos, Civil Responsibility in the Framework of Vicinage: Articles 667-9 and 2315 of the Civil Code, 48 Tul. L.Rev. at 223.

. Id. at 207.

. La. R.S. 30:2015.1(D).

. Stobart v. State, through Department of Transportation and Development, 617 So.2d at 883.

.The Robichaux plaintiffs did not brief all errors assigned. Specifically, they did not brief the alleged errors concerning the trial court’s actual selection of MNA as the most feasible plan. An appellate court may consider as abandoned any assignment of error or issue for review that has not been briefed, Uniform Rules, Courts of Appeal, Rule 2-12.4(B)(4).

. La. R.S. 30:2015.1(D).

. Id.

. In support of its motion, Dow quoted an email statement by plaintiffs’ counsel that their experts’ testimony would be directed to "issues related to the inability of MNA to meet remediation objectives which then triggers the need for a contingency plan.”

.La. C.E. Art. 402 provides that ''[ejvidence which is not relevant is not admissible.” Further, La. C.E. Art. 702 states that a witness who is qualified as an expert may testify in the form of an opinion if “[t]he expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. ...”

. Gaspard v. S. Farm Bureau Cas. Ins. Co., 2013-0800 (La.App. 1 Cir. 9/24/14), 155 So.3d 24, 31; Nitcher v. Northshore Regional Medical Center, 2011-1761 (La.App. 1 Cir. 5/2/12), 92 So.3d 1001, 1006, writ denied, 2012-1230 (La. 9/21/12), 98 So.3d 342; See also La. C.E. Art. 702, comment (d).

. Adams v. Rhodia, Inc., 2007-2110 (La. 5/21/08), 983 So.2d 798, 806.

. Id. at 807.

. La. R.S. 30:2015.1(D).

. La. R.S. 30:2015.1(E)(4).

. Prior to its repeal in 1996, La. Civil Code Article 2315,3 provided, in pertinent part, "[i]n addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiffs injuries were caused by the defendant’s wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.” Article 2315.3 was repealed by Acts 1996, 1st Ex. Sess„ No. 2, § 1, eff. April 16, 1996.

. Thomas v. A. Wilbert &Sons, L.L.C., No. 2010 CW 2308 (La. App. 1 Cir. 1/5/11), writ denied, 2011-0265 (La. 4/8/11), 61 So.3d 685.

. Thomas v. A. Wilbert &Sons, L.L.C., No. 2011 CW 2123 (La. App. 1 Cir. 12/7/11).

. Thomas v. A. Wilbert &Sons, L.L.C., No. 2012 CW 0664 (La. App. 1 Cir. 4/27/12).

. Thomas v. A. Wilbert & Sons, Inc., LLC, 2012-1534 (La. 10/12/12), 98 So.3d 879.

. Terrance v. Dow Chem. Co., 2006-2234 (La. App. 1 Cir. 9/14/07), 971 So.2d 1058, 1063-64, writ denied, 2007-2042 (La. 12/14/07), 970 So.2d 534.

. U.S. Const. Art. I, § 9, cl. 3; U.S. Const. Art. I, § 10, cl. 1; La. Const. Art. I, § 23.

.Specifically, La. R.S. 30:2015.1(F)(1) provides:
In any civil action in which a party is adjudicated responsible for damages or payments for the evaluation and remediation of contamination or pollution that impacts or threatens to impact usable ground water, the party or parties providing evidence, in whole or in part, upon which the judgment is based shall be entitled to recover from the party cast in judgment, in addition to any other amounts to which they may be entitled, all costs, including expert witness fees and reasonable attorney fees attributable to producing that portion of evidence that directly relates to the claims of contamination or pollution that impacts or threatens to impact usable ground water.

. Frank L. Beier Radio, Inc. v. Black Gold Marine, Inc., 449 So.2d 1014, 1015-1016 (La. 1984).

. Robichaux v.State ex rel.Dep't of Health & Hosps., 952 So.2d at 39.

. See M.J. Farms, Ltd. v. Exxon Mobil Corp., 2007-2371 (La. 7/1/08), 998 So.2d 16, 29-30.

. Article I contains two ex post facto clauses, one directed to Congress (§ 9, cl. 3), the other to the states (§ 10, cl. 1).

. Landgraf v. USI Film Prod., 511 U.S. 244, 266, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994).

. Smith v. State, 2010-1140 (La. 1/24/12), 84 So.3d 487, 497.

. In re Craven, 178 La. 372, 376, 151 So. 625, 626 (1930).

. State ex rel. Oliveri v. State, 2000-0172, 2000-1767 (La. 2/21/01), 779 So.2d 735, 744, cert. denied, 533 U.S. 936, 121 S.Ct. 2566, 150 L.Ed.2d 730 (2001).

. See California Dept. of Corrections v. Morales, 514 U.S. 499, 504, 115 S.Ct. 1597, 1601, 131 L.Ed.2d 588 (1995).

. Calder v. Bull, 3 U.S.( 3 Dall.) 386, 1 L.Ed. 648 (1798).

. State ex rel. Olivieri v. State, 779 So.2d at 742; State v. Odoms, 2011-2092 (La.App. 1 Cir. 6/8/12), 94 So.3d 166, 170, writ denied, 2012-1612 (La. 2/22/13), 108 So.3d 762.

.Calder v. Bull, 3 U.S. at 390.

. Smith v. Doe, 538 U.S. 84, 92, 123 S.Ct. 1140, 1146-1147, 155 L.Ed.2d 164 (2003).

. Id., 538 U.S. at 92, 123 S.Ct. at 1147.

. Id., 538 U.S. at 97, 123 S.Ct. at 1149.

. Portley v. Grossman, 444 U.S. 1311, 1312, 100 S.Ct. 714, 715, 62 L.Ed.2d 723 (1980).

. State ex rel. Olivieri v. State, 779 So.2d at 749 (quoting Dept. of Revenue v. Kurth Ranch, 511 U.S. 767, 777, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994).

. Awards of attorney fees in workers’ compensation cases are essentially penal in nature, and are intended to deter indifference and undesirable conduct by employers and insurers toward injured employees, Langley v. Petro Star Corp. of La., 2001-0198 (La. 6/29/01), 792 So.2d 721, 723.

. See Smith v. Doe, 538 U.S. at 97, 123 S.Ct. at 1149.

. Smith v. Doe, 538 U.S. at 102, 123 S.Ct. at 1152.

. La. R.S. 30:2015.1(B).

. Robichaux v. State ex rel. Dep't of Health & Hosps., 952 So.2d at 39.

. See State v. Trosclair, 2011-2302 (La. 5/8/12), 89 So.3d 340, 356 (quoting Flemming v. Nestor, 363 U.S. 603, 614, 80 S.Ct. 1367, 1374, 4 L.Ed.2d 1435 (1960)).

. La. R.S. 30:2015.1(F)(1).

. Rivet v. State, Dept. of Trans. and Development, 96-0145 (La. 9/5/96), 680 So.2d 1154, 1161.

. Under the “lodestar method,” the initial estimate of a reasonable attorney fee is calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. Covington v. McNeese State Univ., 2012-2182 (La. 5/7/13), 118 So.3d 343, 348.

.Rivet v. State, Dept. of Trans, and Development, 680 So.2d at 1161 ( emphasis added).

. Id. at 1161-62.

. Graves v. Babin, 2013-1311 (La.App, 1 Cir. 5/2/14), 147 So.3d 197, 200.

.La. R.S. 30:2015.1(F)(1).

. Dow filed a motion to strike portions of the Robichaux plaintiffs’ original brief with respect to any request for relief by, or on behalf of, counsel for the Thomas subclass. The motion will be addressed at the conclusion of this opinion.

, La. R.S. 13:4203 provides, "Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, 'ex delic-to’, which may be rendered by any of the courts.”

. Sharbono v. Steve Lang & Son Loggers, 97-0110 (La. 7/1/97), 696 So.2d 1382, 1386.

. Id. (citing Prager v. New Jersey Fidelity and Plate Glass Ins. Co., 245 N.Y. 1, 156 N.E. 76 (1927)).

. Sharbono v. Steve Lang & Son Loggers, 696 So.2d at 1386.

. Trans-Glob. Alloy Ltd. v. First Nat. Bank of Jefferson Par., 583 So.2d 443, 457-58 (La. 1991) (citing with emphasis added C. McCormick, Damages, § 50 (1935)).

. Trans-Glob. Alloy Ltd. v. First Nat. Bank of Jefferson Par., 583 So.2d at 458 (quoting Laudenberger v. Port Auth. of Allegheny Cty., 496 Pa. 52, 436 A.2d 147 (1981)).

. La. R.S. 30:2015.1(E)(1).

. La. R.S. 30:2015.1(E)(3).

. La. R.S. 30:2015.1(E)(4).

. Id.

. Sharbono v. Steve Lang & Son Loggers, 696 So.2d at 1387-1388.

. Aucoin v. S. Quality Homes, LLC, 2007-1014 (La. 2/26/08), 984 So.2d 685, 698.

. Anderson v. Dow Chemical Co., 255 Fed. Appx. 1 (5th Cir. 2007).

. Rivet v. State/ Dept. of Trans. and Development, 680 So.2d at 1161.

. Id.

. See Covington v. McNeese State Univ., 118 So.3d at 348.

. Id. at 350.

. Id. at 348.